**George Anthony RUBINO, Petitioner–Appellant,**

v.

**James A. LYNAUGH, Director, Texas Department of Corrections, Respondent–Appellee.**

**No. 87–1444.**

United States Court of Appeals, Fifth Circuit.

May 18, 1988.

---

David W. Coody, Emmett Colvin, Bruner, McColl & McColloch, Dallas, Tex., for petitioner-appellant.

C. Rex Hall, Jr., Jim Mattox, Atty. Gen., Austin, Tex., for respondent-appellee.

**1268**

Before RUBIN, KING, and WILLIAMS, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

George Anthony Rubino seeks a writ of habeas corpus on the grounds that his successive prosecutions and convictions for aggravated kidnapping and attempted murder, arising out of the same criminal transaction, violate the double jeopardy and due process clauses of the United States Constitution. The district court denied the writ. We affirm the district court's decision that the double jeopardy clause raises no bar to the second prosecution and conviction.

The Texas Court of Criminal Appeals, however, affirmed Rubino's attempted murder conviction in reliance on the abandonment of the Texas "carving doctrine," a judicially developed rule barring multiple prosecutions and convictions for offenses "carved" out of a single criminal transaction. If this doctrine, which was still in force at the time of Rubino's offenses, would have barred his second prosecution, the Texas court denied Rubino due process and undermined the constitutional prohibition on *ex post facto* laws by applying retroactively the elimination of the doctrine to affirm his second conviction. Being uncertain how the doctrine would operate in this case, we certify to the Texas Court of Criminal Appeals the single, dispositive question whether the rule, treated as if still in effect, would have barred Rubino's second prosecution and conviction.

**I.**

In March, 1978, Rubino accosted Herbert Weitzman in the parking garage of Weitzman's office building in Dallas, Texas, and ordered him, at gunpoint, to get into his car. Rubino told Weitzman to drive toward South Grand Prairie where Rubino had dug a grave. During the forty-minute drive, Rubino held his pistol on his victim and repeatedly threatened him with violence. Weitzman took the first opportunity, as he slowed the car around a curve, to jump out and run. He heard gunshots and turned to find Rubino firing at him with a pistol, but he managed to escape.

Later in 1978, the State indicted Rubino for aggravated kidnapping. He pleaded not guilty and went to trial. A jury convicted him and sentenced him to fifteen years in prison. The State later indicted him for the attempted murder of Weitzman. Rubino filed a special plea in bar asserting that the attempted murder prosecution was barred under the double jeopardy clause of the Texas Constitution because both that offense and the prior aggravated kidnapping charge were "carved" out of the same criminal transaction. The court denied the plea in bar, and Rubino pleaded *nolo contendere* to the attempted murder charge. The court sentenced him to ten years in prison to run consecutive to the fifteen-year sentence.

Rubino appealed the attempted murder conviction to the Texas Court of Criminal Appeals which affirmed in an unpublished opinion delivered June 9, 1982. The court rejected Rubino's carving-doctrine claim in reliance on *Ex parte McWilliams*,[1] its opinion of May 12, 1982, abandoning the doctrine. Rubino then filed a state habeas petition asserting a double jeopardy bar to the second conviction and challenging the State's retroactive application of the elimination of the carving doctrine. The Texas Court of Criminal Appeals denied habeas relief without written order.

Having exhausted his state remedies, Rubino filed a habeas petition in the United States District Court for the Northern District of Texas. Adopting the findings and conclusions of the magistrate to whom the case was originally referred, the district court found no double jeopardy or due process bar to the second prosecution and conviction and so denied relief.

**II.**

■ Rubino concedes that the double jeopardy test outlined in *Blockburger v.*

1. 634 S.W.2d 815, 822–24 (Tex.Crim.App.1982) (en banc).

*United States*[2] does not bar his second conviction because the Texas statutes define aggravated kidnapping and attempted murder as distinct offenses, each requiring proof of elements that the other does not.[3] He invokes, instead, the "same evidence" test of *Brown v. Ohio*[4] and *Illinois v. Vitale*[5]: "Even if two offenses are sufficiently different to permit the imposition of consecutive sentences, successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the first."[6]

The *Brown* Court cited two cases holding that prior prosecutions barred subsequent ones although the offenses charged were not "the same" under the *Blockburger* test. The first, involving the collateral estoppel of a subsequent prosecution because of a prior acquittal,[7] helps Rubino little as he has no prior acquittal. In the second, *Ex parte Nielsen*,[8] the defendant stood convicted of cohabiting with two wives over a two and one-half year period. The Court held that this conviction barred a subsequent prosecution for adultery with one of the two women on the day following the end of that period because "the adultery charged in the second indictment was an incident and part of the unlawful cohabitation," the latter being a single, continuous offense lasting until the day of the indictment.[9] In response to the State's argument that the charges of adultery and cohabitation required different elements of proof, the Court stressed that Utah's anti-cohabitation statute "was aimed against polygamy or the having of two or more wives; and it is construed by this court as requiring, in order to obtain a conviction under it, that the parties should live together as husbands and wives."[10] The Court found further that sexual intercourse was part of "liv[ing] together as husbands and wives."[11] Thus the cohabitation conviction necessarily rested on the same proof the State subsequently offered in the adultery prosecution, namely that Nielsen had sexual intercourse with a woman outside of a legal marriage. Having once convicted him of this conduct on a cohabitation charge, the State could not reprosecute him for the same conduct on an adultery charge.

The rule to be derived from *Nielsen* is clarified in *Harris v. Oklahoma*[12] and *Illinois v. Vitale*.[13] In *Harris*, the Court held that a defendant who had been convicted of felony-murder could not subsequently be prosecuted for the felony underlying the prior conviction: "When, as here, conviction of a greater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime after conviction of the greater one."[14] Under *Blockburger*, robbery was not, strictly speaking, a lesser-included offense of felony-murder as the felony-murder statute allowed proof of the crime by a number of felonies other than armed robbery. Nevertheless, Harris committed no predicate felony other than robbery, and the State conceded that "in the Murder case, it was necessary for all the ingredients of the underlying felony of Robbery

---

**2.** 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

**3.** *Compare* Texas Penal Code Ann. § 20.04 *with* §§ 15.01 and 19.02 (Vernon 1974).

**4.** 432 U.S. 161, 166 n. 6, 97 S.Ct. 2221, 2226 n. 6, 53 L.Ed.2d 187 (1977).

**5.** 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980).

**6.** *Brown*, 432 U.S. at 166 n. 6, 97 S.Ct. at 2226 n. 6.

**7.** *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

**8.** 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889).

**9.** *Id.* at 185, 9 S.Ct. at 675.

**10.** *Id.* at 189, 9 S.Ct. at 676.

**11.** *Id.* at 186, 9 S.Ct. at 675.

**12.** 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977).

**13.** 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980).

**14.** *Harris*, 433 U.S. at 682, 97 S.Ct. at 2913.

with Firearms to be proved."[15] Because proof of the robbery was indispensable to the murder conviction, the Court held subsequent prosecution for robbery barred.[16]

Similarly, in *Vitale*, the Court held that the defendant "would have a substantial claim of double jeopardy" if the State sought to prove manslaughter charges against him by offering evidence of his failure to slow his automobile to avoid an accident, an offense for which he had already been convicted.[17] That a manslaughter conviction might hypothetically rest on proof of other reckless acts would not justify reprosecution if in fact the State had to rely on evidence undergirding the first conviction in order to obtain the second.

Under the test established in these cases, Rubino's second prosecution did not put him twice in jeopardy. Although in trying Rubino for aggravated kidnapping the State offered evidence that he shot at Weitzman, proof of the attempted murder was not *necessary* to obtain the kidnapping conviction because the State offered sufficient evidence independent of the shooting to support a conviction for aggravated kidnapping.

The elements of aggravated kidnapping under Texas law include intentionally or knowingly "restrain[ing] a person with intent to prevent his liberation by ... using or threatening to use deadly force" "with the intent to ... inflict bodily injury on him."[18] In addition to testimony about the shooting, the State offered evidence that Rubino held a gun on his victim throughout the car ride, said he had a vendetta against Weitzman and his associates for allegedly cheating him in business, boasted of his ability as a marksman and of the number of people he had killed while in the military, announced that he had filed the bullets in his gun in a special way so that, if he shot Weitzman, the injury would be

severe, and told his victim that they were going to a grave Rubino had prepared. This was enough to establish the use of deadly force, the threat to use deadly force, and the intent to inflict bodily harm. In contrast to the situation in *Harris*, the conviction for the "greater crime," aggravated kidnapping, could have been had without the conviction for the "lesser crime," attempted murder. The double jeopardy clause does not, therefore, bar prosecution on the second charge after conviction on the first.[19]

### III.

In affirming Rubino's conviction for attempted murder, the Texas Court of Criminal Appeals relied on its abandonment of the Texas "carving doctrine" in *Ex parte McWilliams*.[20]

> There is no definitive statement of the carving doctrine; it is a nebulous rule applied only in this jurisdiction. Initially, carving was applied when two offenses charged contained common material elements or when the two offenses required the same evidence to convict. *Herera v. State*, 35 Tex.Cr.R. 607, 34 S.W. 943 (1896). This Court added the "continuous act or transaction" test in *Paschal v. State*, 49 Tex.Cr.R. 111, 90 S.W. 878 (1905). Since that time the "same evidence" and the "continuous assaultive transaction" tests have been randomly applied.[21]

Because the two carving-doctrine tests might yield different results, because the Texas courts have not made explicit the criteria for deciding which to apply, and because each test is somewhat unclear standing alone, it remains an open question whether the doctrine would have barred the second prosecution in this case. Nonetheless, the Texas Court of Criminal Ap-

---

15. *Id.*

16. *Accord, Davis v. Herring,* 800 F.2d 513, 516–20 (5th Cir.1986).

17. *Vitale,* 447 U.S. at 419–21, 100 S.Ct. at 2267.

18. Texas Penal Code Ann. §§ 20.01, 20.04 (Vernon 1974).

19. *Cf. Sekou v. Blackburn,* 796 F.2d 108 (5th Cir.1986).

20. 634 S.W.2d at 822–24.

21. *Id.* at 823.

peals has called the abandonment of the doctrine "a clear break with the past," [22] and only that court may answer authoritatively the question whether the doctrine, before the "break," would have barred Rubino's reprosecution. We have decided, therefore, to certify this question to the Court of Criminal Appeals. On certification, that court considers only questions dispositive of the case.[23] We must, therefore, reach and resolve the constitutional issue.

In affirming Rubino's second conviction on the basis of *McWilliams,* the Texas Court of Criminal Appeals denied him the right to claim the protection of a doctrine that was still in force at the time he committed his crimes and that would, under some interpretations, have barred his second prosecution. Rubino asserts that this denial so undermines the constitutional prohibition on *ex post facto* laws as to constitute a due process violation.

■ Article I, § 10, of the United States Constitution forbids the states to pass *ex post facto* laws. This prohibition applies directly only to state legislatures, but the Supreme Court has held that the due process clause protects criminal defendants against action by the judiciary that would contravene the *ex post facto* clause if done by the legislature.[24] The State concedes in its brief that due process analysis of judicial action is interchangeable with *ex post facto* analysis of analogous legislative action.

Relying on this court's decision in *Gabel v. McCotter,*[25] however, the State contends, and the district court intimates, that Rubino's petition presents only a question of state law not cognizable in a federal habeas petition. In *Gabel,* the State trial court enhanced the habeas petitioner's sentence

on the basis of a prior federal felony conviction punishable by imprisonment but not punishable as a crime under Texas law. At the time of Gabel's offenses, the Texas courts enhanced sentences only on the basis of federal felonies that were also crimes under Texas law. Gabel objected to the application of the new interpretation of the enhancement statute to him as a violation of *ex post facto* principles incorporated in the due process clause. This court correctly noted that the determination of what prior crimes should count for enhancement purposes under Texas law was solely for the State and not cognizable in federal habeas corpus.[26] From the premise that the change in Texas law was "purely a question of state evidentiary procedure," the court reasoned that there was no due process violation in its *ex post facto* application.[27]

■ The State and the district court in this case seem to interpret *Gabel* to mean that state law revisions cannot present federal *ex post facto* problems if the new laws are not otherwise subject to constitutional challenge. We agree that the question whether or not to abandon the carving doctrine was solely for the Texas Court of Criminal Appeals, and we express no opinion on the wisdom of its choice. On the other hand, the question whether the retroactive application of the elimination of the carving doctrine undermines *ex post facto* principles is peculiarly within the province of a federal habeas court charged with resolving federal constitutional challenges to the custody of state prisoners.[28]

In a clause separate from the one addressing Congress, the United States Constitution provides, "No *State* shall ... pass

---

**22.** *Ex parte Clay,* 675 S.W.2d 765, 766 (Tex. Crim.App.1984) (en banc).

**23.** Tex.R.App.P. 214.

**24.** *Marks v. United States,* 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977); *Bouie v. City of Columbia,* 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964).

**25.** 803 F.2d 814 (5th Cir.1986), *reh'g denied,* 806 F.2d 1257 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3215, 96 L.Ed.2d 701 (1987).

**26.** *Id.* at 816 (citing *Rubio v. Estelle,* 689 F.2d 533, 536 (5th Cir.1982); *Kemph v. Estelle,* 621 F.2d 162, 163 (5th Cir.1980)).

**27.** *Id.*

**28.** *See* 28 U.S.C. § 2254 (1982).

any ... ex post facto Law." [29] Moreover, the Supreme Court has consistently held the prohibition on *ex post facto* laws applicable to state law changes without regard to whether the changes are subject to constitutional scrutiny on other grounds.[30] Indeed, if *Gabel* stood for the proposition that the *ex post facto* application of otherwise unassailable changes in state law presented no federal due process problem, its effect would be erased because only last term, in a decision subsequent to *Gabel,* the Supreme Court reaffirmed that a State violates the United States Constitution by the retroactive enforcement of a state law, not challenged on its face or in its prospective applications, to the detriment of a criminal defendant.[31] We must follow the more recent Supreme Court pronouncement. Without overstepping the boundaries of our authority under the habeas corpus statute, therefore, we turn to the question whether the change in Texas law, applied in a manner that deprived Rubino of the protection of a doctrine still in effect at the time of his crimes, constituted a violation of the due process clause of the United States Constitution.

In a unanimous 1987 decision vacating a sentence imposed under Florida's revised sentencing guidelines upon a defendant whose crimes had occurred before the effective date of the new guidelines, the Supreme Court reiterated the test for violations of the *ex post facto* clause first articulated in *Calder v. Bull.*[32] The following kinds of laws transgress the clause:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law

that aggravates a crime, or makes it greater than it was, when committed. 3d. *Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.* 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender.[33]

The purposes behind the prohibition on *ex post facto* laws are twofold: to restrain legislatures and courts from arbitrary and vindictive action and to prevent prosecution and punishment without fair warning.[34]

In *Bouie v. City of Columbia,*[35] the Supreme Court held that a judicial enlargement of the coverage of a precisely worded South Carolina criminal trespass statute could not be applied retroactively to punish blacks who had "sat in" at a drugstore lunch counter. Justice Brennan reasoned that the defendants had no "fair warning" that the statute, which on its face punished only "[e]ntry ... after notice prohibiting same," [36] would be construed to punish refusal to depart upon request after an invited, or at least not prohibited, entry. Proceeding from *Bouie's* logic, the Court held in *Marks v. United States* [37] that the standard for identifying hard-core pornography articulated in *Miller v. California,* namely that the materials lacked "serious literary, artistic, political, or scientific value," [38] could not be applied retroactively to punish persons who operated at a time when the governing standard for identifying pornography, under *Memoirs v. Massachusetts,* was whether the materials were "utterly

---

**29.** *Compare* U.S. Const. art. I, § 10, cl. 1 (emphasis added) *with* art. I, § 9, cl. 3.

**30.** *See, e.g., Kring v. Missouri,* 107 U.S. (17 Otto) 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883); *Bouie,* 378 U.S. 347, 84 S.Ct. 1697; *Miller v. Florida,* — U.S —, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987).

**31.** *Miller,* — U.S. —, 107 S.Ct. 2446.

**32.** 3 Dall. 386, 1 L.Ed. 648 (1798).

**33.** *Miller,* — U.S. at —, 107 S.Ct. at 2450 (quoting *Calder,* 3 Dall. at 390 (some emphasis omitted and some added)).

**34.** *Id.* at —, 107 S.Ct. at 2451.

**35.** 378 U.S. 347, 84 S.Ct. 1697.

**36.** *Id.* at 349 n. 1, 84 S.Ct. at 1700 n. 1.

**37.** 430 U.S. 188, 97 S.Ct. 990.

**38.** *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2715, 37 L.Ed.2d 419 (1973).

without redeeming social value." [39] Justice Powell reasoned that to apply *Miller* retroactively would "punish conduct innocent under *Memoirs*" and so violate due process/*ex post facto* norms. [40]

The State correctly points out in its brief that both of these cases rest squarely on a "fair warning" rationale: the *Bouie* and *Marks* defendants had no notice at the time of their conduct that it was criminal; indeed, their conduct may have been innocent when done. Not so with Rubino. He had fair warning, at the time of his offenses, that aggravated kidnapping and attempted murder were crimes in Texas.

■■■ What the State overlooks is that the ban on *ex post facto* legislative or judicial action does more than ensure fair warning; it also curbs vindictiveness. [41] Despite express inquiry by the court, the State's attorney has provided no explanation for Rubino's reprosecution other than the State's dissatisfaction with his first sentence and its desire to obtain a consecutive sentence. Courts and prosecutors may justifiably seek to punish criminals to the full extent of the law, but when they take advantage of changes in the law that put the defendant in a worse position than he was at the time of his crime, we may suspect, and disallow, vindictiveness.

■■■ Moreover, *ex post facto*/due process principles guarantee defendants "fair warning," not only of what is criminal, but also of what punishment attaches to a crime or crimes. Thus, although the defendant in *Miller v. Florida* [42] had adequate notice that the acts for which he was convicted—sexual battery, burglary with assault, and petit theft—were criminal, the Supreme Court vacated his sentence on the ground that it had been imposed under new state guidelines that made his punishment

more onerous than was permissible at the time of his offenses. [43]

■■■ *Kring v. Missouri* [44] shows the reach of the constitutional ban on *ex post facto* increases in punishment. The Supreme Court held in *Kring* that the State of Missouri could not apply retroactively the abolition of a State constitutional provision that protected a defendant charged with first degree murder but convicted of second degree murder against subsequent retrial and conviction for first degree murder. The logic of the provision had been that a conviction for second degree murder constituted an acquittal of first degree murder. After *Kring's* crime, however, Missouri changed its constitution to allow retrials on the maximum charges, and the State applied the new law to convict Kring of first degree murder and to sentence him to death on retrial after reversal of his second degree murder conviction. The Supreme Court overturned the first degree murder conviction and sentence on two grounds: the new State constitutional provision changed the rules of evidence such that "what was conclusive evidence of innocence of the higher grade of murder" at the time of Kring's crime was no longer so; moreover, the new provision changed the punishment applicable to defendants like Kring, subjecting them to death sentences on retrial whereas before they were subject only to imprisonment for the lower grade of murder. [45]

The State seeks to distinguish *Kring* on the ground that Kring's assertion of the Missouri law in effect at the time of his crime would have made him legally innocent of the higher crime, whereas Rubino's assertion of the carving doctrine would never have made him innocent, factually or legally. [46] While this distinction is sound, it misses the second point of *Kring*, namely

---

**39.** *Memoirs v. Massachusetts,* 383 U.S. 413, 418, 86 S.Ct. 975, 977, 16 L.Ed.2d 1 (1966) (plurality opinion).

**40.** *Marks,* 430 U.S. at 191, 97 S.Ct. at 992.

**41.** *Miller,* —— U.S. at ——, 107 S.Ct. at 2451.

**42.** *Id.,* —— U.S. ——, 107 S.Ct. 2446.

**43.** *See also Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981).

**44.** 107 U.S. (17 Otto) 221, 2 S.Ct. 443.

**45.** *Id.* at 228, 2 S.Ct. at 449.

**46.** *See Clay,* 675 S.W.2d at 767.

that a State may not increase the punishment applicable to a crime after the crime is committed. The State argues that the abolition of the carving doctrine did not increase the punishment for any crime because the statutory sentencing ranges applicable to aggravated kidnapping and attempted murder remained the same before and after the *McWilliams* decision. The Missouri constitutional provision at issue in *Kring*, however, did not lengthen the sentence applicable to any crime, but rather changed the crime for which Kring could be charged on retrial and thereby subjected him to greater punishment. *McWilliams* authorized multiple convictions and sentences in some cases in which only one conviction and sentence would have been possible before. Rubino asserts that his is such a case. To subject Rubino to multiple rather than single convictions and sentences is to increase his punishment just as surely as Kring's was increased.

The State cites *Hopt v. Utah*[47] and *Dobbert v. Florida*[48] for the proposition that changes in the law affecting procedural rather than substantive matters do not violate *ex post facto* principles. Thus, in *Hopt* the Supreme Court upheld the defendant's murder conviction and death sentence even though based on the testimony of a convicted felon who, at the time of Hopt's crime, would have been an incompetent witness under the law of Utah. The Court found Utah's enlargement of the class of people competent to testify merely a procedural change because "The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute."[49] Similarly, in *Dobbert,* the Supreme Court held "merely procedural" a change in the law of Florida that removed the death sentencing function from the jury and vested it in the trial judge who sentenced with the advice of the

jury. A defendant sentenced under the latter procedure had no right to resentencing by a jury alone although the law at the time of his murders called for a jury alone.

The abolition of the carving doctrine, by contrast, is not merely a procedural change. In *Miller v. Florida,* Justice O'Connor wrote, "a change in the law that alters a substantial right can be *ex post facto* 'even if the statute takes a seemingly procedural form.' "[50] We do not see how the abolition of the carving doctrine takes a "procedural form." *McWilliams* authorizes distinct, additional prosecutions and convictions rather than simply changing the course to a result. Moreover, the demise of the doctrine affects a substantial right, the right to be free of multiple prosecutions and punishments for offenses arising out of one criminal transaction. If the carving doctrine would have barred Rubino's second prosecution and conviction, the State deprived him of due process in affirming his conviction in reliance on the abandonment of a protective rule in force at the time of his offenses.

As the State itself contends alternatively, a Texas court should decide whether the carving doctrine would indeed have barred reprosecution in this case. The Texas trial court in which Rubino challenged the attempted murder prosecution denied his plea in bar on the ground that "approximately thirty seconds" elapsed between the aggravated kidnapping and the attempted murder: "the Court finds thats [*sic*] one offense and the elements in the evidence going to show the elements thereof were completed prior to the commission of the offense [of attempted murder]."[51] Relying only on the retroactive application of *McWilliams,* the Texas Court of Criminal Appeals declined to review this interpretation of the carving doctrine as permitting a thirty-second break between Weitzman's flight and Rubino's shooting to establish

---

**47.** 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884).

**48.** 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

**49.** *Hopt,* 110 U.S. at 589–90, 4 S.Ct. at 210.

**50.** *Miller,* —— U.S. at ——, 107 S.Ct. at 2453 (quoting *Weaver,* 450 U.S. at 29 n. 12, 101 S.Ct. at 964 n. 12).

**51.** *Texas v. Rubino,* No. F–78–8476–IL (Tex. Crim.Dist.Ct., Dallas Cty., Oct. term, 1978).

two criminal transactions. We therefore have no authoritative state ruling on whether the doctrine would bar the second prosecution and conviction.

■ Because the carving doctrine is peculiarly a creature of state law, and a creature that the Texas Court of Criminal Appeals has called "nebulous" and "erratic,"[52] comity dictates that we certify to the Texas court the question whether the doctrine, treated as if still in effect, would have barred Rubino's attempted murder prosecution, conviction, and sentence. Texas Rule of Appellate Procedure 214 permits certification, if "it appears to the certifying court that there is no controlling precedent in the decisions of the Court of Criminal Appeals" and the question is "determinative of the cause then pending."[53] Considering the Court of Criminal Appeals' own characterization of the doctrine, we find no controlling precedent. The question we certify is determinative of this case because, if the doctrine invalidates Rubino's reprosecution, we must vacate his second conviction and sentence; if the doctrine does not bar his reprosecution, his second conviction and sentence stand, and he will have received the relief to which he is entitled in having his case adjudicated under the rule in force at the time of his crimes.

The question to be certified to the Texas Court of Criminal Appeals might be phrased as follows: "Would the Texas carving doctrine, treated as if still in effect, have barred Rubino's prosecution and conviction on the attempted murder charge?" We disclaim any intention or desire that the Texas Court of Criminal Appeals confine its reply to the precise form or scope of the question certified.

52. *McWilliams*, 634 S.W.2d at 823–24.

53. The Rule provides, in relevant part:
The Court of Criminal Appeals may answer questions of state criminal law certified to it by the Supreme Court of the United States or a United States Court of Appeals when requested by the certifying court, if there are involved in any proceedings before the certifying court questions of criminal law of this state which may be determinative of

Counsel for the parties shall have fifteen days to confer and to submit to this court a proposed agreed statement of the case and phrasing of the question to be certified. If the parties cannot agree on either the statement of the case or the question for certification, the petitioner will prepare a proposed statement and question within fifteen days, and the State will file its objections and counter-proposals within seven days thereafter.[54]

For the foregoing reasons, we AFFIRM the district court's denial of habeas relief under the double jeopardy clause, REVERSE the denial of relief under the due process clause, and CERTIFY to the Texas Court of Criminal Appeals the question whether the carving doctrine would have barred Rubino's attempted murder prosecution, conviction, and sentence.

KING, Circuit Judge, specially concurring:

I concur in the panel's disposition of Rubino's double jeopardy claim. However, although I also concur in the result reached by the majority on the *ex post facto* issue, the case presents issues which I believe the majority does not address. It is to these issues, which I find controlling, that this concurrence is directed.

My concern with finding an *ex post facto* violation in this case arises out of the Texas Court of Criminal Appeals' own characterization of the viability of the carving doctrine as a judicial doctrine in that jurisdiction. In *Ex parte McWilliams*, 634 S.W.2d 815 (Tex.Crim.App.) (en banc), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982), the decision in which the Texas Court of Criminal Appeals abandoned the carving doctrine, that court asserted "there is no definitive statement of

the cause then pending and as to which it appears to the certifying court that there is no controlling precedent in the decisions of the Court of Criminal Appeals. The Court of Criminal Appeals may, in its discretion, decline to answer the questions certified to it.

54. *See Petroleum Helicopters, Inc. v. Avco Corp.*, 804 F.2d 1367, 1373 (5th Cir.1986).

the carving doctrine" and further described the doctrine as "a nebulous rule." *Id.* at 823. The Texas court then reviewed a series of its own apparently unreconcilable decisions under the doctrine to show the doctrine's fickleness. *Id.; see also Orosco v. State,* 590 S.W.2d 121, 124–28 (Tex.Crim. App.1979) (dissent sets forth myriad examples of the same type of apparently unreconcilable decisions). The court concluded that in at least one prior case in which it had denied relief from a conviction by applying one test established under the doctrine, denominated as a "same evidence" test, the opposite result would have been compelled by a second test, denominated as a "same transaction" test, also established under the doctrine. *McWilliams,* 634 S.W. 2d at 823 (citing *Robinson v. State,* 530 S.W.2d 592 (Tex.Crim.App.1975)). Referring again to these two divergent and apparently unreconcilable tests for determining whether a particular prosecution would be forbidden under the carving doctrine, the Texas Court of Criminal Appeals suggested that its prior carving doctrine decisions "lack[ed] [ ] precedential value." *Id.* In deciding to abandon the doctrine, the court concluded that "[t]he doctrine of carving is unsound and its application has been erratic." *Id.* at 824. Subsequently, in *Ex parte Clay,* 675 S.W.2d 765 (Tex. Crim.App.1984) (en banc), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1399, 84 L.Ed.2d 787 (1985), the court gave retroactive effect to *McWilliams'* abolishment of the carving doctrine defense. In that decision, the court noted again the "conflict" between the two tests for determining whether a prosecution could be avoided under the doctrine. *Id.* at 767.

Under *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), no *ex post facto* violation occurs unless a defendant is "substantially disadvantaged" by a retroactive application of law.[1] 450 U.S. at 29, 101 S.Ct. at 964; *see also Miller v. Florida,* —— U.S. ——, 107 S.Ct. 2446,

2451–52, 96 L.Ed.2d 351 (1987) (discussing *Weaver*). The threshhold question that arises under *Weaver*—and that remains unanswered by the majority—is whether a criminal defendant can be substantially disadvantaged when the judicial doctrine that defines the "substantial" right purportedly denied to the defendant is so contradictory, and its application by the courts so erratic, that the outcome of the defendant's case under the doctrine is itself uncertain.

The majority's discussion of *Kring v. Missouri,* 107 U.S. (17 Otto) 221, 27 L.Ed. 506 (1883), does not resolve this issue. Kring's initial plea of guilt to second degree murder made him legally innocent of a higher degree crime under the Missouri state constitution as it existed at the time of his crime. However, the second degree conviction was reversed on a sentencing issue. Upon amendment of the Missouri state constitution, the trial court rejected Kring's claim of legal innocence to first degree murder under the former constitution. Instead, Kring was retried for first degree murder—a capital crime. He was convicted and sentenced to death. Under the facts of *Kring,* the effect of a retroactive application of the Missouri constitutional amendment was absolutely clear: by eliminating a defense previously available to Kring—legal innocence of a higher degree crime—the retroactive application of the law through a second prosecution subjected Kring to a greater punishment for his crime. *Kring* was premised on a clearly delineated defense that, at the time of his crime, was absolute and entirely predictable. The issue before the Court in *Kring* was not whether abrogation of the defense operated to the substantial disadvantage of Kring—everyone knew that the disadvantage was the death sentence—but whether the change in law was procedural. 107 U.S. (17 Otto) at 446. In *McWilliams,* on the other hand, the Texas court clearly articulated that its prior carving doctrine

---

1. The *ex post facto* clauses, article I, sections 9 and 10, of the United States Constitution, are directed only towards retroactive legislation. However, as noted by the majority and conceded by the parties, *ex post facto* principles apply here to retroactive state judicial rulings

under a fifth- and fourteenth-amendment due process analysis. *Marks v. United States,* 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977); *Bouie v. City of Columbia,* 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894 (1964).

decisions lacked precedential value because they provided no single, cognizable rule for predicting the circumstances under which a carving doctrine defense would be successful. At first blush, it is far from clear that recission of the defense here would substantially disadvantage Rubino since its effect, according to the Texas court, was entirely unpredictable. *Kring* did not address this issue.

Furthermore, the same uncertainty regarding the "prosecutability" of a crime under the carving doctrine raises the additional question whether the policies which undergird the *ex post facto* clauses would be furthered by an *ex post facto* holding in this case. In *Miller,* the Supreme Court restated the dual concerns which underlie an *ex post facto* inquiry: " 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.' " 107 S.Ct. at 2451 (quoting *Weaver,* 450 U.S. at 29, 101 S.Ct. at 964). Applying "fair notice" and "governmental restraint" concerns to this case, is it fair to state that the fickle carving doctrine gave notice to Rubino that a particular prosecution (and its attendant punishment) would be avoided, creating a reliance interest? And did the retroactive abrogation of the doctrine reflect vindictive or abusive lawmaking? An affirmative answer to either question would buttress an *ex post facto* holding in this instance—but only if the threshhold inquiry, whether a retroactive recission of the carving doctrine results in a "substantial disadvantage" to a criminal defendant, also were true. I, therefore, focus first on this threshhold inquiry.

To determine whether Rubino has been substantially disadvantaged by the retroactive abrogation of the carving doctrine, the relative posture of a criminal defendant, both pre- and post-*McWilliams,* first must be determined. Although the carving doctrine appears to evade capture as a definitive rule of law, both *McWilliams* and *Clay* indicated that the alternative tests or prongs of the doctrine—which defined its breadth—were well established, even if unreconcilable. In *Clay,* the Texas Court of

Criminal Appeals clearly equated the less favorable prong of the carving doctrine, which it called the "same evidence" test, with a double jeopardy inquiry under *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Clay,* 675 S.W.2d at 767. Because this less favorable prong of the doctrine, according to the *Clay* court, is the equivalent of *Blockburger,* it necessarily survived the carving doctrine through the constitutionally mandated double jeopardy defense. Hence, a criminal defendant suffers no substantial disadvantage by the retroactive repeal of the "same evidence" prong of the carving doctrine so long as Texas courts give effect to extant *Blockburger* jeopardy doctrine, which state courts, of course, are required to do under the supremacy clause.

However, the alternative test under the carving doctrine, which the Texas Court of Criminal Appeals labeled the "continuous assaultive transaction" test, in some cases provided a broader basis for barring a prosecution than the "same evidence" test. In other words, in instances in which the "same evidence" test did not bar prosecution, a "continuous assaultive transaction" analysis might have done so. *McWilliams,* 634 S.W.2d at 823 (citing *Robinson,* 530 S.W.2d at 592). Therefore, since the Texas court in *Clay* confirmed that the "same evidence" test survived as a *Blockburger* double jeopardy inquiry, a double jeopardy analysis limited to such an inquiry necessarily falls short of the protections embodied in the former "continuous assaultive transaction" test, which applied a more favorable standard for denying multiple prosecutions. This abridgement of the bases available for barring a prosecution was the effect plainly intended by the *McWilliams* court, which justified its repeal of the carving doctrine on the logic that "prosecution for each of the separate offenses" was necessary to effectuate a policy of deterrence through increased punishment. 634 S.W.2d at 822. Clearly, the "continuous assaultive transaction" test of the carving doctrine provided a more favorable basis for avoiding multiple prosecutions than

currently is available to a Texas criminal defendant.

However, while recognizing that elimination of the more favorable prong of the carving doctrine generally disfavors criminal defendants seeking to avoid multiple prosecutions, to be *ex post facto*, the change in law still must substantially disadvantage the individual who is claiming the protection of the doctrine. *Weaver*, 450 U.S. at 29, 101 S.Ct. at 964. It is here that the fickleness of the Texas doctrine intervenes. Because of the apparently "erratic" and undisciplined application of the two carving doctrine tests by Texas courts, a criminal defendant such as Rubino cannot show that his particular case would have been *entitled* to evaluation under the more favorable "continuous assaultive transaction" test while the doctrine was still in effect. Thus, since no scheme existed under the carving doctrine to guide Texas courts in determining which of the two tests to apply, and perhaps because the tests themselves are heavily fact dependent, the "continuous assaultive transaction" test represented to a criminal defendant nothing more than a *possibility* that the court *might* apply a more favorable standard in ruling whether a multiple prosecution would be barred. Nonetheless, it is clear to me that, despite the doctrine's undisciplined application in the courts, the *McWilliams* court, by eliminating the carving doctrine, did eliminate the opportunity for a court to invoke the "continuous assaultive transaction" test, and it did foreclose the attendant possibility that a court would reject a prosecution as prohibited by this more favorable arm of the doctrine. Hence, the real effect of a retroactive application of *McWilliams* is that a defendant is denied the *possibility* that the court will apply a more favorable standard than the *Blockburger* double jeopardy standard for rejecting a prosecution, and that denial of this more favorable standard thereby abridges the defendant's *opportunity* for a lesser punishment—punishment for one crime rather than multiple crimes arising out of a particular criminal transaction.

Having determined the extent to which a retroactive abolishment of the carving doc-trine will alter the rights of a criminal defendant in Texas courts, I must determine whether the change in the law has substantially disadvantaged Rubino for purposes of the *ex post facto* doctrine. I conclude that it has. Under *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), a lawmaker cannot retroactively foreclose even the *possibility* that a criminal defendant would receive a lesser sentence than was potentially available at the time the crime was committed. In *Lindsey*, the law effective at the time of Lindsey's offense provided for a minimum sentence of six months and a maximum sentence of fifteen years. At the time Lindsey was sentenced, the law provided for a mandatory fifteen-year sentence. Finding that retroactive application of the mandatory fifteen-year sentence was *ex post facto*, the Supreme Court noted, "It is plainly to the substantial disadvantage of petitioners to be deprived of all *opportunity* to receive a sentence which would give them freedom from custody and control prior to the expiration of the fifteen-year term." 301 U.S. at 401–02, 57 S.Ct. at 799 (emphasis added). Similarly, to deny Rubino the opportunity to avoid prosecution under the most favorable sweep of the law as it existed at the time of his crime, the "continuous assaultive transaction" test, is plainly to his substantial disadvantage.

The Court in *Lindsey* further explained that "the *ex post facto* clause looks to the standard of punishment prescribed by a [judicial doctrine], rather than to the sentence actually imposed." *Id.* The petitioner in *Lindsey* could claim no entitlement to a particular sentence under the law as it existed at the time of his crime; that determination, within the range provided, was at the sole discretion of the trial court. But the Court held that, even where the sentence actually imposed was within the range of possible punishments at the time of the crime, the "removal of the *possibility* of a sentence of less than fifteen years" —at the trial court's discretion—operated to substantially disadvantage Lindsey. *Id.* (emphasis added). Similarly, the fact that Rubino apparently would not have been

absolutely entitled under the carving doctrine to application of the more favorable test, the "continuous assaultive transaction" test, does not negate the fact that, prior to the doctrine's recission, the possibility existed that the court would choose to employ the broader prong of the doctrine. Under *Lindsey*, Rubino need not prove that he was *actually* disadvantaged by elimination of the carving doctrine defense—*i.e.*, that his second prosecution actually would have been barred by the court under the "same assaultive transaction" test. The retroactive elimination of the broader *potential* to avoid a multiple prosecution (and therefore its attendant punishment) constituted a substantial disadvantage.

However, a determination whether Rubino was "substantially disadvantaged" by retroactive abolishment of the carving doctrine does not end here. Rubino received the full measure of due process to which he was entitled at the trial court level. At the time when the trial court evaluated—and rejected—Rubino's carving doctrine defense, which Rubino had raised pretrial with a special plea in bar, the *Clay* decision had not yet issued. In denying Rubino's special plea in bar,[2] the trial court applied a "same evidence" test. In addition, the court applied a version of the "continuous assaultive transaction" test which focused on whether the elements of one offense had been completed prior to the commission of another offense. *See, e.g., Ex parte Joseph*, 558 S.W.2d 891, 893 (Tex.Crim.App. 1977). Of course, as discussed above, Rubino was not entitled to a specific test under the doctrine, but merely to have the court determine the "prosecutability" of the offense under any prong of the doctrine. This the court did. Rubino's due process claim in the *ex post facto* abolishment of his defense therefore arises solely

out of the Texas Court of Criminal Appeals' refusal to review the trial court's disposition of the special plea in bar. Thus, the issue becomes one whether, for purposes of an *ex post facto* analysis, the denial of appellate review substantially disadvantages a criminal defendant.

The Supreme Court's recent decision in *Miller v. Florida*, —— U.S. ——, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), clearly established that a denial of an otherwise established right to appellate review constitutes a "substantial disadvantage" within reach of the *ex post facto* doctrine. In *Miller*, the petitioner received a seven-year sentence. Under Florida law in effect at the time of Miller's crime, a seven-year sentence was outside the range of punishment presumed correct for Miller's offense; the sentencing judge could have imposed such a sentence, but the judge would have been required to provide a written explanation for imposing the sentence, setting forth clear and convincing reasons based upon facts proven beyond a reasonable doubt. Further, the sentence would have been reviewable on appeal. Under the new guidelines, which the sentencing court applied, a seven-year sentence was presumptively correct. 107 S.Ct. at 2452. The Supreme Court rejected retroactive application of the new sentencing guidelines because they "foreclosed [Miller's] ability to challenge the imposition of a sentence longer than his presumptive sentence under the old law." *Id.* at 2452. Likewise, I find that Rubino may not be foreclosed from challenging the trial court's disposition of his carving doctrine defense. Although the Texas Court of Criminal Appeals' prior decisions under the doctrine may have been erratic, Rubino nonetheless is entitled to pursue the defense to its full potential, particularly since the review powers of the Texas Court of

2. The concluding paragraph of the trial court's ruling set forth the court's basis for denying Rubino's special plea in bar:

The Court further finds that it will be necessary for the State to prove different elements in trying the Defendant George Anthony Rubino for the offense of Attempted Murder, and even though both said offenses being the Aggravated Kidnapping and the Attempted Mur-

der are assaultive offenses, the Court finds thats [sic] one offense and the elements in the evidence going to show the elements thereof were completed prior to the commission of the offense alleged in Cause F–78–8476–IL, and therefore find [sic] that the Defendant's Special Plea in Bar, based on the reasons set forth in said plea, should be and the same is hereby in all things denied.

Criminal Appeals appear to be plenary with respect to this doctrine.

Having determined that, under *Lindsey* and *Miller*, the retroactive abolishment of the carving doctrine substantially disadvantaged Rubino, I also conclude that the policies of "fair notice" and "governmental restraint," which underlie an *ex post facto* analysis, would be furthered by an *ex post facto* finding in this case. The majority opinion, when reviewing the policies embodied in the *ex post facto* doctrine, focuses on a perceived vindictive or abusive motive by the state in prosecuting Rubino for the attempted murder, having already obtained a conviction for aggravated kidnapping. However, I cannot ascribe a vindictive motive to the state—as the majority appears to do—merely for prosecuting a defendant, who undeniably has committed a crime, when the Texas Court of Criminal Appeals itself, the definitive arbiter of Texas criminal law, disclaims any ability to distill a rule from its prior decisions which would differentiate those prosecutions forbidden under the carving doctrine. Furthermore, the principle of "governmental restraint" in the *ex post facto* context restricts the actions of lawmakers, not law enforcers. *See Miller*, 107 S.Ct. at 2451. Thus, I find no restraint problem in the state's decision to prosecute Rubino for attempted murder; I am convinced, nonetheless, that the principle of restraint applies here to the Texas Court of Criminal Appeals' decision to repeal an established legal defense.

The *McWilliams* court specifically articulated a basis for repealing the carving doctrine that, while generally legitimate and even compelling, raises concerns of governmental vindictiveness if retroactively applied. The court opened its opinion on rehearing in *McWilliams* with the following explanation of its reasons for discarding the carving doctrine:

> We now abandon the carving doctrine for the compelling reason that it encourages crime. When the carving doctrine may be applied to a situation in which a defendant robs, kidnaps, rapes, and murders his victim, *the defendant suffers no more punishment than he would had he committed only one of the crimes.*

> *Justice and reason demand prosecution for each of the separate offenses so that a robber will be deterred from kidnapping, raping, and murdering the victim.*

634 S.W.2d at 822 (emphasis added). The Texas court clearly recognized that the effect of its action was to increase punishment for multiple offenses arising out of a criminal transaction. In fact, the court's intent was to discourage crime by allowing each offense to be punishable. The power to so alter its law clearly rests with the Texas court, but the court's malcontent with the carving doctrine's operation may not be visited retroactively upon Rubino. Policies of individual deterrence, by definition, are forward-looking rather than retroactive.

Furthermore, "fair notice" principles also are implicated here. The fact that sentencing guidelines in *Miller*—or the outcome under a judicial doctrine in this case—may be changeable, discretionary or uncertain does not invalidate the prescribed range of punishments extant at the time of the offense. "The constitutional prohibition against *ex post facto* laws cannot be avoided merely by adding to a law notice that it might be changed." *Miller*, 107 S.Ct. at 2451–52. Thus, the apparently inconsistent applications of the carving doctrine, while reflecting that the dual tests were inconsistent, did not negate Rubino's reliance that the doctrine nonetheless would be applied. Nor does a court's discretion to choose among a range of punishments negate a criminal defendant's reliance that the full spectrum of punishments, including the most lenient, will be available to the sentencing court. *Lindsey*, 301 U.S. at 401–02, 57 S.Ct. at 799. Under the Supreme Court's decisions in *Miller* and *Lindsey*, Rubino had a reliance interest in the carving doctrine as it existed at the time his crimes were committed.

Despite the fickle character of the Texas carving doctrine, Rubino still suffers a substantial disadvantage by retroactive denial of review of the trial court's disposition of the defense. For the foregoing reasons, I CONCUR in the majority's decision to certi-

fy to the Texas Court of Criminal Appeals the question answered once already at the trial court level:

Whether, if treated as still in effect, the carving doctrine would have barred Rubino's prosecution for attempted murder?

As the majority points out, our analysis of state law questions is directed solely towards resolving the *ex post facto* issue raised by Rubino; the Texas Court of Criminal Appeals remains the final authority on the substance of Texas criminal law. This concurrence reaches no farther than the constitutional issue, and makes no evaluation or analysis of the proper disposition of this question under Texas law.