UNITED STATES of America, Plaintiff–Appellee,

v.

John Wesley MOREHEAD, Sr., John Wesley Morehead, Jr., and Jackie Ray Hill, Defendants–Appellants.

Nos. 91–7003, 91–7009 and 91–7010.

United States Court of Appeals, Tenth Circuit.

March 4, 1992.

R. Jay Cook, Muskogee, Okl., on briefs, for John Wesley Morehead, Sr.

David Booth, Tulsa, Okl., for John Wesley Morehead, Jr.

* The Honorable Daniel B. Sparr, United States District Judge, District of Colorado, sitting by designation.

Vester Songer, Hugo, Okl., for Jackie Ray Hill.

Sheldon J. Sperling, Asst. U.S. Atty. (John Raley, U.S. Atty., with him on the brief), Muskogee, Okl., for plaintiff-appellee.

Before MOORE and BALDOCK, Circuit Judges, and SPARR, District Judge.*

BALDOCK, Circuit Judge.

Defendants-appellants John Wesley Morehead, Sr. ("Senior"), John Wesley Morehead, Jr. ("Junior"), and Jackie Ray Hill appeal their convictions and sentences following a jury verdict on various conspiracy and substantive charges relating to the cultivation, distribution and possession of marijuana and the use of firearms. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2).

This prosecution stemmed from the inadvertent discovery by state law enforcement officers of marijuana plants at Senior's residence. Senior lived in a house located in a rural section of southeastern Oklahoma near Hugo. Junior, who was Senior's eighteen year old son, lived in Hugo with his mother but stayed with Senior on weekends. While attempting to execute arrest warrants for Senior and Junior on an unrelated charge, officers observed marijuana plants in an open trailer and inside a camper and shop building behind the house. Officers subsequently arrested Hill, the boyfriend of Senior's sister, who was seen fleeing from a nearby wooded area just north of Senior's house, and Wesley Lane Morehead ("Lane"), Senior's fifteen year old son, who was hiding in some bushes in the woods. During a search of Senior's residence, officers discovered 7.8 kilograms of dried marijuana, several guns, two-way radios and police scanners in the house, and 360 marijuana plants from four to ten inches tall growing in paper cups in the trailer, camper and shop building. Senior and Junior turned themselves in to state authorities a few days later.

Defendants were charged in a ten-count superseding indictment with conspiracy and substantive offenses relating to the cultivation and distribution of marijuana and the use of firearms during such activity. Count 1 ("the marijuana conspiracy") charged Defendants with conspiracy to manufacture, possess with intent to distribute, and distribute marijuana. 21 U.S.C. § 846. Count 2 ("the firearms conspiracy") charged Defendants with conspiracy to use or carry firearms during and in relation to the distribution, manufacture, possession with intent to distribute, and a conspiracy to distribute, manufacture, and possess with intent to distribute marijuana. 18 U.S.C. § 371. Count 3 charged Defendants with possession with intent to distribute twenty-five pounds of marijuana. 21 U.S.C. § 841(a)(1). Count 4 charged Defendants with attempting to manufacture, distribute and possess with intent to distribute marijuana. 21 U.S.C. § 846. Count 5 charged Defendants with maintaining a place for the purpose of manufacturing, storing or distributing marijuana. 21 U.S.C. § 856(a)(1). Count 6 charged Defendants with renting a building for the purpose of manufacturing, storing or distributing marijuana. 21 U.S.C. § 856(a)(2). Count 7 charged Defendants with using or hiring a person under eighteen years of age in the marijuana conspiracy. 21 U.S.C. § 845b(a)(1). Count 8 charged Hill with using or carrying a firearm during the commission of a drug trafficking felony, and count 9 charged the same against Senior and Junior. 18 U.S.C. § 924(c). Finally, count 10 charged Hill with possession of methamphetamine. 21 U.S.C. § 844(a).

Following a jury trial, Senior was convicted of counts 1, 2, 3, 4, 5, 6 and 7, but he was acquitted of count 9—the substantive firearms count. Junior was convicted of counts 1 and 2—the marijuana and firearms conspiracies—while he was acquitted of all the substantive marijuana counts and the substantive firearms count. Hill was convicted solely on count 2—the firearms conspiracy—and he was acquitted of all remaining counts.

Senior challenges the lawfulness of the search of his residence. He also contends that fundamental error existed in allowing the prosecution to select the federal forum. Hill and Junior both challenge their convictions based on insufficient evidence. Senior and Junior each raise different multiplicity arguments—Senior contends that counts 5 and 6 are multiplicious, and Junior contends that counts 1 and 2 are multiplicious. Finally, all three Defendants allege error in the application of the sentencing guidelines.

## I.

■ Senior challenges the search by law enforcement officers on essentially two grounds. He argues that the initial warrantless intrusion by sheriff's officers violated the Fourth Amendment. Additionally, he argues that the affidavit in support of the search warrant was insufficient. We find no merit in either argument.

## A.

On Friday, April 13, at approximately 4:00 or 4:30 p.m., Choctaw County Undersheriff Mike Mitchell, along with Deputy Sheriff Jimmy Long, went to Senior's house to enforce arrest warrants for Senior and Junior on an unrelated burglary charge. There was a car in the carport and a pickup truck with a trailer attached parked in front of the house just south of the property. After receiving no response at the front door, the officers walked to the back of the house. From the back corner of the house, they noticed a trailer approximately 50 feet from the back door of the house. The trailer was a converted pickup truck bed which had four foot plywood siding attached to it on three sides. From a distance of approximately 50 feet, the officers observed marijuana plants in the trailer. After a closer inspection of the trailer, the officers then approached the nearby shop building and looked through the window observing marijuana plants growing in paper cups under fluorescent lights. Long then looked through the window of the camper, also located in the backyard, and observed more marijuana plants growing under florescent lights.

The officers then went back to their vehicle, radioed for assistance, and Mitchell left to obtain a search warrant while Long remained on the premises.

■ Senior contends that the officers' act of walking to the back of the house and looking through the windows of the shop building and camper violated the Fourth Amendment. The curtilage of a house is protected under the Fourth Amendment to the extent that "an individual reasonably may expect that the area in question should be treated as a home itself." *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987) (citing *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984)). However, even if we assume that Senior could reasonably expect the area from where the officers made their observations "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life," *id.* (citations and internal quotations omitted), the officers' limited intrusion was justified in their execution of a valid arrest warrant.

■ Senior does not challenge the validity of the arrest warrant[1] but rather contends that it did not authorize a search of the premises. "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). If a law enforcement officer may enter a suspect's house to execute an arrest warrant when the officer has reason to believe the suspect is inside, the officer most certainly may walk to the back of the house and peer through the windows of a shop building and camper located on the property when he has reason to believe that the suspect is on the premises. *See United States v.*

*Pallais*, 921 F.2d 684, 691 (7th Cir.1990) (entire "complex of buildings" constituted suspect's residence thereby permitting officers with valid arrest warrant to enter house even though defendant slept in apartment above detached garage). The officers knew that Senior resided at the house, and the presence of a car in the carport and a truck in front of the house gave the officers reason to believe that Senior was on the premises. Therefore, the mere act of walking to the back of the house cannot be considered unreasonable given that the officers were executing an arrest warrant.

■ While there was some dispute before the district court over whether the officers could see 8–10 inch marijuana plants in a trailer with four foot siding from their vantage point near the house some 50 feet away, the district court resolved this factual dispute in favor of the government. In reviewing the denial of a motion to suppress, we must accept factual findings by the district court unless they are clearly erroneous. *United States v. Neu*, 879 F.2d 805, 807 (10th Cir.1989). Given that there was evidence that the officers's vantage point was slightly elevated from the location of the trailer thus permitting the officers to look down into the trailer, and that some of the plants were sticking through cracks between the sideboards, we cannot say that the finding by the district court was clearly erroneous.

Finally, the fact that the officers looked through the windows of the shop building and camper did not violate the Fourth Amendment. From his vantage point at the trailer, Undersheriff Mitchell observed an illuminated light inside the shop building. Similarly, Deputy Long observed a light in the camper. This could have reasonably led the officers to believe that Senior was inside the shop building or camper. Therefore, assuming arguendo that Senior

---

1. The arrest warrants were issued out of Lamar County, Texas, and were for an unrelated burglary charge. It is not clear under what authority Oklahoma officers were executing Texas arrest warrants. Nevertheless, Senior's failure to raise this issue on appeal and the lack of any factual development of this issue below lead us

to conclude that Senior has waived any challenge to the validity or execution of the arrest warrant. *See United States v. Rascon*, 922 F.2d 584, 587–88 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2037, 114 L.Ed.2d 121 (1991).

had a reasonable expectation of privacy in the interior of the shop building and camper, the officers' limited intrusion of peering through the window during the execution of a valid arrest warrant did not violate the Fourth Amendment.

### B.

After viewing marijuana plants in the trailer, shop building and camper, the officers obtained a warrant authorizing a search of the "[r]esidence, outbuildings and vehicles" located on the property. The affidavit submitted by Mitchell in support of the warrant attested to his and Deputy Long's observations of marijuana in the open trailer and shop building. The affidavit recited Mitchell's experience in the recognition and identification of marijuana plants. The affidavit also indicated that shots had been fired at the scene. The affidavit stated that Deputy Long had seen two suspects in the area and they had dropped their weapons during a chase. Finally, the affidavit claimed that a nighttime search was necessary to secure the officers' safety.

Senior makes two arguments as to the insufficiency of the search warrant. First, he contends that the affidavit was not sufficient to justify a nighttime search, nor did the issuing magistrate make a particular finding that a nighttime search was justified. Second, he contends that the affidavit contains factual inaccuracies thereby rendering it insufficient.

### 1.

In the Fourth Amendment context, "the factor of a nighttime search is sensitively related to the reasonableness issue." *United States v. Gibbons*, 607 F.2d 1320, 1326 (10th Cir.1979). However, the record does not support Senior's contention that the search was conducted at night. The district court found that the search began between 7:00 and 7:30 p.m. when it was still daylight. The sole evidence on this issue was the testimony of Undersheriff Mitchell and Deputy Long who both testified that at the time the search began it was not dark. Given that this is the only

evidence in the record, we cannot say that the district court's finding was clearly erroneous.

Assuming arguendo that there was some evidence that the search did not begin until night, Senior cites no controlling authority supporting the unreasonableness of such a search under the circumstances. Senior directs our attention to Oklahoma law which requires that a search warrant be executed during the day "unless the affidavits be positive that the property is on the person, or in the place to be searched, and the judge finds that there is a likelihood that the property named in the search warrant will be destroyed, moved or concealed." Okla.Stat. tit. 22, § 1230. Absent these specific findings by the magistrate, a warrant is insufficient under Oklahoma law to authorize a nighttime search. *Wiggin v. State*, 755 P.2d 115, 117 (Okla.Cr.1988); *Fletcher v. State*, 735 P.2d 1190, 1193 (Okla.Cr.1986). Here, the state magistrate did not make the specific finding as required under Oklahoma law.

Both parties agree that the search was "state in character." Indeed, the warrant was issued by a state judge, upon application by a state officer, executed by state officers, and returnable to the issuing state judge. *See Gibbons*, 607 F.2d at 1325; *United States v. Millar*, 543 F.2d 1280, 1284 (10th Cir.1976). When a search is state in character, "the warrant and affidavits need only conform to federal constitutional requirements in order for the resulting evidence to be admissible in a federal prosecution." *Gibbons*, 607 F.2d at 1325 (citations omitted). *See also Millar*, 543 F.2d at 1283. Indeed, "violation of state law ... would not render the evidence obtained inadmissible in federal courts." *On Lee v. United States*, 343 U.S. 747, 754–55, 72 S.Ct. 967, 972, 96 L.Ed. 1270 (1952) (citing *Olmstead v. United States*, 277 U.S. 438, 468, 48 S.Ct. 564, 569, 72 L.Ed. 944 (1928)). Given the fact that the marijuana could have readily been moved or destroyed, and that neither Senior or Junior were in custody at the time, the officers' search, even if it was conducted in the evening, was not unreasonable.

*See Gibbons*, 607 F.2d at 1327 (nighttime search was reasonable in order to expedite investigation and aid officers in locating suspects).

### 2.

■ Senior next contends that the affidavit contained "factually incorrect information" and "erroneous assertions." Our review of the affidavit reveals two inaccuracies. First, the affidavit states that shots had been fired at the scene when, in fact, only one shot was fired at the scene, and this was by Deputy Long during his pursuit of Hill. Second, the affidavit indicated that Deputy Long had seen two suspects in the area and they had dropped their weapons during a chase when, in fact, Deputy James Day, one of the officers who responded to Mitchell and Long's request for assistance, retrieved the two weapons, and there was no indication that the weapons had been dropped by the suspects during a chase. Even if Mitchell intentionally submitted these inaccuracies to the issuing magistrate, a point which finds no support in the record, it would make no difference to the validity of the warrant. *See Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978) (when affidavit contains materially false information which was submitted intentionally or with reckless disregard for the truth by law enforcement officer, court should redact false information and review affidavit de novo to determine whether remaining allegations establish probable cause). *See also United States v. Ross*, 920 F.2d 1530, 1533 (10th Cir.1990). Absent the allegations of shots being fired, or suspects dropping their weapons during a chase, the affidavit, established probable cause for the search.

In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Court "reaffirm[ed] the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations." *Id.* at 238, 103 S.Ct. at 2332 (citations omitted). The Court articulated the standard for both the issuing magistrate and the reviewing court:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for ... concluding that probable cause existed.

*Id.* at 238–39, 103 S.Ct. at 2332 (internal quotation and citation omitted). "[V]iew[ing] the affidavit in a common-sense, nontechnical manner," and giving "deference ... to the prior determination of probable cause by the issuing authority," *United States v. Barrera*, 843 F.2d 1576, 1581 (10th Cir.), *cert. denied*, 488 U.S. 859, 109 S.Ct. 153, 102 L.Ed.2d 124 (1988), we hold that the affidavit in support of the warrant was sufficient. The officers' observations of marijuana plants in the trailer and shop building adjacent to the residence by the affiant officer, provide a substantial basis for the issuing magistrate's conclusion that the affidavit as a whole established by a fair probability that contraband or evidence of a crime would be found on the property.

### II.

■ Senior contends that his conviction should be reversed or he should be given a downward departure because of fundamental error due to the prosecution's choice of a federal forum. All three Defendants initially were charged in state court, but these charges were dismissed, and Defendants were indicted by a federal grand jury. Senior argues that because a federal conviction entails more severe consequences than a state conviction in terms of the length of the sentence and mandatory imprisonment, there must be some articulated standard, other than the "whim of the prosecutors," in selecting the forum. Senior does not allege that the government's choice of a federal forum was based on an impermissible classification or Senior's exercise of a legal right. *See Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524,

1531, 84 L.Ed.2d 547 (1985). Rather, Senior asserts that

> the potential for abuse requires that [the government's forum selection] must be controlled by ... internal or external guidelines, [and] unless there exists a definite and formulated standard with which to follow in selecting the forum, the unbridled discretion by the prosecution violates an individuals right to due process and equal protection of the law.

██ While the consequences to Senior from a federal conviction are certainly more severe as compared to a state conviction, this factor alone does not render the government's choice of a federal forum unconstitutional. "[S]o long as the prosecutor has probable cause to believe the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file ... generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). Although "there are undoubtedly constitutional limits" upon the exercise of prosecutorial discretion, *id.* at 365, 98 S.Ct. at 669, we do not believe that this case approaches those limits. In the absence of proof that the choice of forum was improperly motivated or based on an impermissible classification as a matter of constitutional law, the prosecutor's discretion to prosecute in a federal rather than a state forum does not violate due process or equal protection notwithstanding the lack of any articulated guidelines for the exercise of such discretion. *United States v. Andersen*, 940 F.2d 593, 596–97 (10th Cir.1991) (lack of "any articulated policy or written guidelines" in deciding to prosecute in federal rather than state court does not violate due process). *See also United States v. Raymer*, 941 F.2d 1031, 1036–39 (10th Cir.1991) (rejecting argument that federal prosecution was merely a "sham and a cover" for an impermissible state prosecution).

### III.

Both Junior and Hill challenge their conspiracy convictions based on insufficient evidence. In reviewing the sufficiency of the evidence to sustain a criminal conviction, our task is to determine whether the "evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). *See also Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *United States v. Leaverton*, 835 F.2d 254 (10th Cir.1987). This deferential standard recognizes that it is "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. *See also United States v. Record*, 873 F.2d 1363, 1367 (10th Cir.1989).

██ "The evidence in a conspiracy prosecution must show that two or more persons agreed to violate the law, that the defendant knew at least the essential objectives of the conspiracy, and that the defendant knowingly and voluntarily became a part of it." [2] *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990) (citing *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir. 1988)). *See also U.S. v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir.1991) (conspiracy conviction requires government to prove that "(1) a conspiracy existed, (2) the defendant knew the essential objectives of the conspiracy, and (3) the defendant knowingly and voluntarily became a part of it").

---

**2.** Additionally, a conspiracy charged under 18 U.S.C. § 371, such as the count 2 firearms conspiracy, requires proof of an overt act. *United States v. Savaiano*, 843 F.2d 1280, 1293–94 (10th Cir.1988). Proof of an overt act is not required for a drug conspiracy charged under 21 U.S.C. § 846, such as the count 1 marijuana conspiracy. *Id.* at 1294. Neither defendant's challenge to the sufficiency of the evidence on count 2 contends that the government failed to prove an overt act.

■ "[T]he jury may presume that a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy." *United States v. Brown*, 943 F.2d 1246, 1250 (10th Cir.1991) (citing *United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir.1990)). *See also Savaiano*, 843 F.2d at 1294 ("[p]articipation [in a conspiracy] may be inferred from the defendant's actions") (citation omitted). "A single overt act by the defendant can be sufficient to connect him to the conspiracy if that act leads to a reasonable inference of intent to participate in an unlawful agreement or criminal enterprise." *United States v. Pack*, 773 F.2d 261, 266 (10th Cir.1985) (citing *United States v. Pilling*, 721 F.2d 286, 292–93 (10th Cir.1983)). However, the evidence from which a defendant's knowledge of the essential objectives of the conspiracy may be inferred must be "clear and unequivocal." *United States v. Austin*, 786 F.2d 986, 988 (10th Cir.1986). *See also Direct Sales Co. v. United States*, 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943); *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir.1982). Additionally, a conspiracy conviction requires "at least the degree of criminal intent necessary for the substantive offense itself." *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959); *Austin*, 786 F.2d at 988; *Dumas*, 688 F.2d at 86.

"The core of a conspiracy is an agreement to commit an unlawful act." *Esparsen*, 930 F.2d at 1471. *See also United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128 (1940). Proof of an agreement rarely is susceptible to direct evidence, and may be inferred from the facts and circumstances of the case. *Iannelli v. United States*, 420 U.S. 770, 777 n. 10, 95 S.Ct. 1284, 1289 n. 10, 43 L.Ed.2d 616 (1975); *Fox*, 902 F.2d at 1514; *U.S. v. Kendall*, 766 F.2d 1426, 1431 (10th Cir.1985). "[T]he critical inquiry is whether the circumstances, acts, and conduct of the parties are of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists." *Kendall*, 766 F.2d at 1431.

■ In determining whether an agreement can be reasonably inferred from "the circumstances, acts, and conduct of the parties," we recognize that a defendant's "guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement." *United States v. Horn*, 946 F.2d 738, 741 (10th Cir.1991) (citing *Kotteakos v. United States*, 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946); *United States v. Harrison*, 942 F.2d 751, 755–56 (10th Cir.1991); *Fox*, 902 F.2d at 1514). In order to reasonably infer such an agreement, the Defendants' conduct must be interdependent with the conduct of the alleged coconspirators. *Horn*, 946 F.2d at 740; *United States v. Daily*, 921 F.2d 994, 1007 (10th Cir.1990), *cert. denied*, — U.S. —, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991); *Fox*, 902 F.2d at 1514. Interdependence is present if "the activities of a defendant ... facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole...." *Horn*, 946 F.2d at 740–41 (citing *Fox*, 902 F.2d at 1514). "Casual transactions" or "mere association" with persons involved in criminal activity is insufficient to establish the interdependence of a defendant's conduct. *See id.* at 741. *See also Fox*, 902 F.2d at 1514. We cannot sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference. *Direct Sales*, 319 U.S. at 711, 63 S.Ct. at 1269; *Fox*, 902 F.2d at 1513.

### A.

■ Hill, who was convicted solely of count 2, the firearms conspiracy, makes two arguments concerning the sufficiency of the evidence. First, he contends that there was no evidence that he knew or should have known of the marijuana cultivation, distribution and possession. Second, he contends that there was no evidence of an agreement to use or carry firearms during and in relation to the commission of a drug trafficking offense.

### 1.

 Hill's challenge regarding his lack of knowledge raises a question concerning what a person charged with conspiring to commit a crime which itself requires the commission of another crime must know and intend in order to be a participant in the conspiracy.[3] Count 2 alleged that Defendants conspired to use or carry firearms during and in relation to the commission of particular drug trafficking crimes. The unlawful objective of the conspiracy was to violate 18 U.S.C. § 924(c).[4] The particular underlying drug trafficking crimes were the marijuana conspiracy alleged in count 1 and three substantive title 21 offenses which were also alleged as the unlawful objectives of the marijuana conspiracy.

 The primary objective of a conspiracy to violate § 924(c) is the use or carrying of firearms. Indeed, the legislative history of § 924(c) makes clear that the mandatory prison term Congress provided was to deter the use of firearms, albeit during the commission of a drug trafficking offense or crime of violence.[5]

3. We have found only two other reported cases charging § 924(c) as the unlawful objective of a conspiracy, both of which were prosecuted in the Eastern District of Oklahoma by the same assistant United States Attorney who prosecuted the present case. *See United States v. Sullivan,* 919 F.2d 1403 (10th Cir.1990); *United States v. Bullock,* 914 F.2d 1413 (10th Cir.1990). Neither case provides any guidance in determining the requisite knowledge and intent for a conspiracy to violate § 924(c). In *Sullivan,* § 924(c) was charged as the unlawful objective of a 21 U.S.C. § 846 conspiracy. This was improper because the unlawful objective of a § 846 conspiracy must be an offense defined within the Controlled Substances Act. 919 F.2d at 1435. In *Bullock,* we sustained a conviction for conspiracy to violate § 924(c) by construing the indictment as charging the use of a firearm during a drug conspiracy. 914 F.2d at 1414.

4. This statute provides in relevant part, "[w]hoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment...." 18 U.S.C. § 924(c)(1). It is well settled that "section 924(c)(1) defines a separate crime rather than merely enhancing the punishment for other crimes." *United States v. Hunter,* 887 F.2d 1001, 1003 (9th Cir.1989) (per curiam), *cert. denied,* 493 U.S. 1090, 110 S.Ct. 1159, 107 L.Ed.2d 1062 (1990). *Accord United States v. Munoz–Fabela,* 896 F.2d 908, 910 (5th Cir.) ("section [924(c)(1)] constitutes an independent basis for criminal liability"), *cert. denied,* —— U.S. ——, 111 S.Ct. 76, 112 L.Ed.2d 49 (1990). *Cf. United States v. Wilkins,* 911 F.2d 337, 338 n. 1 (9th Cir.1990) (defendant may be convicted of § 924(c) without being convicted of underlying crime of violence or drug trafficking crime); *United States v. Robertson,* 901 F.2d 733, 734 (9th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 395, 112 L.Ed.2d 405 (1990) (same); *United States v. Wilson,* 884 F.2d 174, 176–77 (5th Cir.1989) (defendant may be charged in a single-count indictment with § 924(c)). *See also Simpson v. United States,* 435 U.S. 6, 10, 98

S.Ct. 909, 911, 55 L.Ed.2d 70 (1978) (construing earlier version of § 924(c) as "creat[ing] an offense distinct from the underlying federal felony"); *United States v. Sudduth,* 457 F.2d 1198, 1201 (10th Cir.1972) (same); H.R.Rep. 99–495, 99th Cong., 2d Sess. 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1336 (Congressional recognition that pre–1986 version of § 924(c) is a "separate offense" as opposed to a "penalty enhancement statute"). Because 18 U.S.C. § 371 proscribes conspiring "to commit any offense against the United States," § 924(c) may properly be charged as the unlawful objective of a § 371 conspiracy.

5. Section 924(c), as originally enacted, provided for a one to ten year sentence for using a firearm to commit a felony or carrying a firearm unlawfully during the commission of a felony. Gun Control Act of 1968, Pub.L. No. 90–618, § 102, 82 Stat. 1213. Although there are no committee reports or congressional hearings on the original enactment because it was offered as·an amendment on the House floor and passed on the same day, *Busic v. United States,* 446 U.S. 398, 405, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980) (citing 114 Cong.Rec. 22231, 22248 (1968)); *Simpson,* 435 U.S. at 13, 98 S.Ct. at 913, Representative Poff, the bill's sponsor, stated that the law was intended "to persuade the man who is tempted to commit a Federal felony to leave his gun at home. Any such person should understand that if he uses his gun and is caught and convicted, he is going to jail." 114 Cong.Rec. 22231 (daily ed. July 19, 1968). *See also id.* at 22237 ("any person who commits a crime and uses a gun will know that he cannot get out of serving a penalty in jail") (statement of Rep. Rogers).

In response to Supreme Court decisions holding that a defendant could not be sentenced under § 924(c) when the underlying offense provided for an increased sentence for use of a firearm during its commission, *Busic,* 446 U.S. at 407, 100 S.Ct. at 1753; *Simpson,* 435 U.S. at 16, 98 S.Ct. at 914, and to the possibility that the sentence for a violation of § 924(c) was not mandatory, could run concurrently, and might permit

However, using or carrying a firearm violates § 924(c) only when it is done during and in relation to the commission of a drug trafficking crime or crime of violence. A substantive violation of § 924(c)(1) requires proof that the defendant committed the underlying drug trafficking offense or crime of violence. *United States v. Munoz–Fabela*, 896 F.2d 908, 910 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 76, 112 L.Ed.2d 49 (1990); *United States v. Hunter*, 887 F.2d 1001, 1003 (9th Cir.1989) (per curiam). *See also United States v. Sudduth*, 457 F.2d 1198, 1200 (10th Cir. 1972) (construing earlier version of § 924(c) as "dependant on the basic felony"); H.R.Rep. No. 99–495, 99th Cong., 2d Sess. 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1335 (Congressional recognition that "proof of the defendant's commission of the [underlying] crime . . . is necessary" to convict under § 924(c)). Given that the government must prove that the defendant possessed the criminal intent necessary for the commission of the substantive offense in order to convict him of conspiracy, *Ingram*, 360 U.S. at 678, 79 S.Ct. at 1319;

*Austin*, 786 F.2d at 988; *Dumas*, 688 F.2d at 86, we believe that the government must prove that Hill knew about at least one of the drug trafficking offenses, and that he participated or intended to participate in one as well.[6]

 In determining whether the evidence was sufficient for the jury to infer that Hill knew of the marijuana cultivation and participated or intended to participate in it, Hill's acquittal on the count 1 marijuana conspiracy and the substantive marijuana offenses does not weigh in our independent review of the sufficiency of the evidence. In *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), the defendant was convicted of using the telephone in "committing and in causing and facilitating" a conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute, 21 U.S.C. § 843(b), while being acquitted of the cocaine conspiracy and the substantive possession charges. Notwithstanding that the § 843(b) charges were interdependent with the cocaine conspiracy

---

the offender to be eligible for parole, Congress substantially revised § 924(c). *See* Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 1005, 98 Stat. 1837, 2138. *See also* H.R.Rep. No. 98–1030, 98th Cong., 2d Sess. 312, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3490–3491. The stated purpose of the revision was to

> ensure that all persons who commit Federal crimes of violence, including those crimes set forth in statutes which already provide for enhanced sentences for their commission with a dangerous weapon, receive a mandatory sentence, without the possibility of the sentence being made to run concurrently with that for the underlying offense or for any other crime and without the possibility of a probationary sentence or parole.

H.R.Rep. No. 98–1030, 98th Cong., 2d Sess. 313, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3491 (footnote omitted).

In 1986, Congress again amended § 924(c) by including drug trafficking crimes in addition to crimes of violence, within the scope of criminal activity to be subject to additional penalties when a firearm is used. *See* Firearm Owners' Protection Act, Pub.L. No. 99–308, § 104(a)(2), 100 Stat. 449, 456 (1986). The purpose of this amendment was to "strengthen the Gun Control Act of 1968 to enhance the ability of law enforcement to fight violent crime and narcotics trafficking . . . [and] provide an important new weapon against narcotics traffickers by mandat-

ing that a person who uses or carries a firearm during and in relation to a drug trafficking crime shall be subject to a mandatory prison term of five years." H.R.Rep. No. 99–495, 99th Cong., 2d Sess. 1–2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327–1328. Congress amended § 924(c) again in 1988, substantially increasing the penalties for repeat offenders. *See* Anti–Drug Abuse Act of 1988, Pub.L. 100–690, § 6460, 102 Stat. 4181, 4373–4374.

Although charging § 924(c) as the unlawful objective of a conspiracy under § 371 does not insure the mandatory prison term that Congress contemplated because a defendant is subject to a sentence imposed under 18 U.S.C. § 371, the legislative history makes clear that the punishment was intended to deter and punish the use of a firearm during and in relation to certain specified criminal activity. Therefore, we believe the primary objective of a conspiracy to violate § 924(c) is the use or carrying of firearms, not the commission of the underlying drug trafficking offense.

6. Contrary to the dissent's suggestion, we do not take the position that an 18 U.S.C. § 924(c) offense can be established without proof of an underlying drug trafficking crime or crime of violence. Rather, we merely recognize that count 2 charged Hill with a violation of 18 U.S.C. § 371 by conspiring to violate § 924(c).

and possession charges,[7] the Supreme Court held that an inconsistent verdict is not a basis for reversal. *Id.* at 64–65, 105 S.Ct. at 476. The Court reasoned:

> inconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.... Given this uncertainty, and the fact the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course.

*Id.* at 65, 105 S.Ct. at 477. The Court recognized that "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." *Id.* at 67, 105 S.Ct. at 478. The Court expressly cautioned that "[t]his review should be independent of the jury's determination that the evidence on another count was insufficient." *Id.* Thus, contrary to the dissent's conclusion in the present case, we may not rely on the fact that the jury acquitted Hill of the marijuana conspiracy and substantive offenses in determining the sufficiency of the evidence on the count for which he was convicted.

Having said this, we conclude that the evidence, when construed in the light most favorable to the government, is sufficient for the jury reasonably to infer that Hill knew marijuana was being cultivated at Senior's residence and that he intended to participate in this activity. There was substantial direct evidence that marijuana was being cultivated at Senior's residence. Hill admitted that he brought a tractor and tiller, which he had access to from working on a ranch, out to the house, and showed Senior how to operate it. Senior instructed Lane later that same evening to "help" Hill "the next day." Hill returned to Senior's residence the following afternoon and used the tractor to till a pasture in the woods near Senior's residence while Lane fertilized the pasture. While returning from the pasture, Lane, who was driving Senior's pickup, and Hill, who was driving the tractor, saw the game warden's truck parked in the drive leading up to the house. Hill motioned with his head to Lane to back up, which he did. Hill told Lane to "stay low" and left him in the woods instructing him to "stay right there." Hill then ran across the road "in a crouched position with [his] head down." At this point, he was spotted by Game Warden Smalling and Deputy Long. Hill continued running after being ordered to stop, but eventually stopped when Long fired a shot into the ground. Notwithstanding Hill's denials and explanations,[8] resolution of these factual issues is within the province of the jury.[9] Hill's provision

---

7. Four of the overt acts charged in the cocaine conspiracy for which the defendant was acquitted were the telephone conversations charged as § 843(b) violations. *Powell,* 469 U.S. at 60, 105 S.Ct. at 474. The Court also recognized for purposes of its opinion that the government must prove the commission of the felony allegedly facilitated by the use of the telephone—*i.e.* the very felonies for which the defendant was acquitted. *Id.* at 60 n. 2, 105 S.Ct. at 474 n. 2.

8. Although Hill denied tilling the pasture, his testimony directly contradicted Lane's testimony. Further, Hill explained his attempted evasion of the officers claiming that he feared arrest by the game warden for setting up feeders to lure game into the area outside of hunting season.

9. The government contends that Hill's knowledge may be inferred from his inconsistent explanations to officers following his apprehension. Game Warden Smalling testified that Hill said he was "just turkey hunting" or that he was "looking for turkeys." Deputy Long testified that Hill later said that he had been preparing spots for deer feeders. In light of the evidence that the feeders which Hill claimed to have set up are used for both deer and turkey, we do not believe these explanations are so inconsistent as to warrant an inference of knowledge of the marijuana cultivation.

Further, the government sought to elicit testimony from Lane that Hill told him they were going out to the pasture to "plant some weed." Lane's testimony does indicate that Hill "hollered" something to him from the living room

of the tractor and tilling of the pasture near the marijuana cultivation activity at Senior's residence, and his attempted evasion of law enforcement officers is sufficient circumstantial evidence for the jury to infer that Hill knew of the marijuana cultivation and intended to participate in it. *See Sullivan*, 919 F.2d at 1429 (jury could reasonably infer defendant's knowledge of essential objectives of methamphetamine manufacturing conspiracy from evidence that defendant weighed chemicals and packed groceries and bedding into truck used to move lab equipment).

### 2.

■ Hill also contends that there was no evidence that he agreed to use or carry firearms. Hill brought two pistols and rifle when he went to Senior's residence to till the pasture. Although he left these firearms in his truck, the fact that he brought them in his truck knowing that he was to be assisting in the cultivation of marijuana evidences an agreement to carry firearms. Moreover, Lane had a .22 caliber rifle with him when he and Hill tilled and fertilized the pasture. Finally, an AR–15 rifle, subsequently determined to belong to Junior, was found in the cab of Senior's pickup which Lane used to haul the fertilizer out to the pasture. The presence of these guns in the proximity of Hill's activity relating to the cultivation of marijuana is sufficient evidence for the jury to infer that Hill agreed to use or carry firearms

during and in relation to the commission of a drug trafficking offense.

### B.

■ Junior was convicted of both the marijuana conspiracy charged in count 1 and the firearms conspiracy charged in count 2, and he also challenges his convictions based on insufficient evidence. The crux of Junior's argument is that there was no evidence that he agreed to participate in the manufacturing, distribution, or possession with intent to distribute marijuana or to carry firearms during the commission of any of these offenses. However, Junior admitted that he knew that marijuana was being grown at the house. Based on his admitted knowledge of the illegal activity, it is reasonable to infer from Junior's conduct, in light of the surrounding circumstances, that he agreed to participate in the unlawful activity.

### 1.

As earlier stated, the evidence clearly established that marijuana was being cultivated at Senior's residence. Junior assisted Senior in renting the house by signing of the rental agreement and delivering the rental payments despite Junior's knowledge that Senior was involved in marijuana.[10] Junior admitted that he stayed at the house on weekends, at times with his girlfriend Angela Caldwell. Junior also admitted that on one occasion, at Senior's request, he brought a jug of water to Senior

while Lane was in the hallway which sounded something "around [the] basis" of "preparing plots for marijuana," or "kind of sounded something like" "plant some weed." However, Lane could not remember what Hill said, and eventually admitted that he assumed, after seeing all the marijuana seized from his father's house, the reason he assisted Hill in tilling and fertilizing the pasture was related to marijuana. Indeed, he unequivocally stated that no one ever mentioned marijuana to him inside his father's house until the police officers questioned him. Thus, we believe that Lane's testimony could provide some evidence of Hill's knowledge or intent to participate in the cultivation of marijuana, depending on what the jury believed.

We cannot accept Hill's argument that the jury evidently believed Lane's repudiation because it acquitted him of the marijuana conspiracy as

well as the substantive marijuana and firearms counts. Our review of the sufficiency of the evidence to convict Hill of the count 2 firearms conspiracy must "be independent of the jury's determination that the evidence on another count was insufficient." *Powell,* 469 U.S. at 67, 105 S.Ct. at 478.

**10.** In August or September 1989, Junior became aware that Senior was in possession of marijuana. Junior walked in on Senior one day at the house of Junior's great-grandmother when Senior had marijuana spread out on the floor. According to Junior, he "didn't want no part of it," but that they "kind of made an agreement ... because [Junior] hadn't never been around [Senior] except probably close to him for the last three months." Senior and Junior's mother had divorced when Junior was an infant, and Senior had been living in Texas until a few months before this incident.

in the shop building, and, on another occasion during a rainstorm, he unplugged the lights that were being used to grow marijuana plants in the camper because he "didn't want something to catch on fire and get electrocuted." On April 13, 1991, activity was occurring near the property which a jury could reasonably infer was related to the cultivation of marijuana. Junior admitted that he was at the house that morning, and his loaded AR–15 rifle was found in Senior's truck which had been used to carry fertilizer out to the field that had been recently cultivated. Caldwell, Junior's girlfriend, was inside the house. Further, officers found two clear plastic bags of marijuana, a box of clear plastic bags, and an operational police scanner in Junior's bedroom. From the marijuana and bags, the jury could reasonably infer that Junior himself was distributing marijuana. Alternatively, the jury could infer that Junior was taking marijuana from Senior in exchange for his assistance in cultivating marijuana. Either inference would be sufficient to connect Junior to the conspiracy and support a conviction. While we recognize that both Junior and Senior denied that Junior participated in any way with the cultivation or distribution of marijuana, the jury was free to reject their denials. We believe that sufficient evidence was presented for a jury to reasonably infer that Junior agreed to cultivate, distribute and possess with intent to distribute marijuana. *See Esparsen,* 930 F.2d at 1472 (agreement to distribute narcotics could "rationally be inferred" from the "frequent contacts" among the defendants and "their joint appearances at transactions and negotiations").

### 2.

Having found sufficient evidence that Junior was part of the marijuana conspiracy, we also believe the evidence was sufficient for the jury to infer that Junior agreed to use or carry firearms during the commission of a drug trafficking offense. Junior admitted that he kept his guns at his father's house, but claimed that he did not "have those guns out there for any purpose that was related to [his] father's marijuana business." Junior said that he used his guns for "spotlighting," "target practice," "shoot trees," "just anything." Again, however, credibility determinations are uniquely within the province of the jury, and the jury was free to find that Junior's guns at the house were part of the conspiracy. This inference is supported by the uncontradicted evidence that the loaded AR–15 was in Senior's truck found near the shed and tractor with fertilizer on it, and Junior not only admitted ownership of the gun but admitted that he left the gun in the truck.

### IV.

Both Senior and Junior raise multiplicity arguments. Senior contends that count 5 is multiplicious of count 6 and suggests that one count should be dismissed. Junior contends that count 1 is multiplicious of count 2, and suggests that the rule of lenity requires that he be sentenced under count 2 because it is less onerous.

"[M]ultiplicity refers to multiple counts of an indictment which cover the same criminal behavior." *United States v. Dashney,* 937 F.2d 532, 540 n. 7 (10th Cir.) (citing *United States v. Chrane,* 529 F.2d 1236, 1237 n. 3 (5th Cir.1976)), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991). While multiplicity is not fatal to an indictment, *United States v. Duncan,* 850 F.2d 1104, 1108 n. 4 (6th Cir.1988), it poses the threat of multiple sentences for the same offense and may improperly suggest to the jury that the defendant has committed more than one crime. *Id.* See also *United States v. Marquardt,* 786 F.2d 771, 778 (7th Cir.1986); *United States v. Reed,* 639 F.2d 896, 904 (2d Cir.1981); *United States v. Carter,* 576 F.2d 1061, 1064 (3d Cir.1978). The threat of multiple sentences for the same offense raises double jeopardy implications. *See Brown v. Ohio,* 432 U.S. 161, 169, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187 (1977) ("Fifth Amendment forbids ... cumulative punishment for greater and lesser included offenses") (footnote omitted).

 We review multiplicity claims, to the extent they raise the possibility of multiple sentences for the same offense, notwithstanding the Defendants' failure to raise a pretrial motion to dismiss based on multiplicity.[11] *See Dashney,* 937 F.2d at 540–41. Although the terms of imprisonment for Junior and Senior on the counts alleged to be mulitiplicious run concurrently, when, as here, separate $50 penalty assessments are imposed on the allegedly multiplicious counts, we can not rely on the "concurrent sentence doctrine" to avoid review of Defendants claims. *Ray v. United States,* 481 U.S. 736, 737, 107 S.Ct. 2093, 2093, 95 L.Ed.2d 693 (1987) (per curiam); *Sullivan,* 919 F.2d at 1429 n. 42. Even without the additional penalty assessments, we will review multiplicity claims because they "go[ ] to the fundamental validity of one conviction," *Dashney,* 937 F.2d at 541, and a criminal conviction, in addition to imprisonment and a penalty assessment, presents "potentially adverse collateral consequences." [12] *Ball v. United States,* 470 U.S. 856, 865, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985).

 Where multiple counts for which a defendant is convicted cover the same criminal behavior, our review is limited to whether Congress intended multiple convictions and sentences under the statutes. *See Garrett v. United States,* 471 U.S. 773, 779, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985). *See also Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983). We first look to the language of the statutes and then to legislative history to discern Congressional intent regarding multiple convictions and

sentences. If Congressional intent cannot be discerned, we apply the well-settled "rule of statutory construction" set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), "to determine whether Congress has in a given situation provided that two statutory offenses may be punished cumulatively." *Whalen v. United States,* 445 U.S. 684, 691, 100 S.Ct. 1432, 1437, 63 L.Ed.2d 715 (1980). *Accord Albernaz v. United States,* 450 U.S. 333, 337, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981). *See also Raymer,* 941 F.2d at 1044 (*"Blockburger* ... remains the test in the multiple punishment context"). This test was articulated by the Supreme Court as follows:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182. Because we must assume that Congress legislated with *Blockburger* in mind, *Albernaz,* 450 U.S. at 341–42, 101 S.Ct. at 1143–44, we presume, absent express Congressional intent to the contrary, that Congress intended multiple convictions and sentences for the same criminal behavior which violates more than one statute when each statute requires proof of a fact that the other does not.

## A.

 The charging language of counts 5 and 6 indicates that they are based on the same conduct. Count 5 charged a violation

---

**11.** The government cites *United States v. Marroquin,* 885 F.2d 1240 (5th Cir.1989), *cert. denied,* 494 U.S. 1079, 110 S.Ct. 1807, 108 L.Ed.2d 938 (1990), for the proposition that failure to object to an indictment on multiplicity grounds prior to trial constitutes a waiver of the objection. We agree with the *Marroquin* court to the extent that Defendants, having failed to object prior to trial, cannot now complain about the possible prejudice to them in the eyes of the jury. *See United States v. Mastrangelo,* 733 F.2d 793, 800 (11th Cir.1984). However, as the *Marroquin* court recognized, a failure to object on multiplicity grounds prior to trial does not waive the

multiple sentences issue. 885 F.2d at 1245. *See also Mastrangelo,* 733 F.2d at 800.

**12.** In *Ball,* the Court recognized the separate conviction, apart from the concurrent sentence, could delay the defendant's eligibility for parole, increase his sentence under a recidivist statute for a future offense, be used to impeach the his credibility, and lead to a "societal stigma." *Ball,* 470 U.S. at 865, 105 S.Ct. at 1673. While the Court's concerns about the effect on the defendant's parole eligibility are not relevant to the present case because Defendants' sentences were imposed under the sentencing guidelines, the other collateral consequences remain valid.

of 21 U.S.C. § 856(a)(1) by "unlawfully, knowingly, and intentionally open[ing] and maintain[ing] a place for the purpose of manufacturing, storing, distributing, or using a controlled substance, namely marijuana. . . ." Count 6 charged a violation of 21 U.S.C. § 856(a)(2) by "unlawfully, knowingly and intentionally rent[ing], leas[ing] or mak[ing] available for use, with or without compensation, a building(s), room(s), or enclosure(s) for the purpose of unlawfully manufacturing, storing, distributing or using a controlled substance, namely marijuana. . . ." Both counts state that the place at issue was the house, and both counts allege the same time period.

Nothing in the statutory language or legislative history of 21 U.S.C. § 856 indicates that Congress intended multiple punishment for conduct violative of subsections (a)(1) and (a)(2).[13] Therefore, we apply the *Blockburger* test to the statutes at issue. Subsection (a)(1), prohibits "knowingly open[ing] or maintain[ing] any place for the purpose of manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1). Subsection (a)(2), prohibits manag[ing] or control[ling] any building, room or enclosure, either as an owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally rent, lease, or make available for use, with or without compensation, the building, room or enclosure for the purpose of unlawfully manufacturing, storing, distributing or using a controlled substance.

*Id.* § 856(a)(2). The government argues that "[o]ne may lease without maintaining and vice versa." While this may be true, subsection (a)(2) also requires proof that the defendant managed or controlled the house. In this case, we see no fundamental difference between managing or controlling the house and maintaining the house. While count 6 may also require proof that the defendant rented, leased, or made the house available for use, count 5 does not require proof of any additional

fact. Given any clear statement of legislative intent to the contrary, application of the *Blockburger* rule leads us to conclude that subsections (a)(1) and (a)(2) are the same offense.

■■■ Generally, when two counts for which a defendant is convicted are multiplicious, the conviction on the lesser included offense must be vacated. *United States v. Stallings*, 810 F.2d 973, 976 (10th Cir.1987); *United States v. Dickey*, 736 F.2d 571, 597 (10th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Count 5 charging the violation of subsection (a)(1) is the lesser included offense of count 6 because it "requires no proof beyond that which is required for conviction of the greater." *See Brown*, 432 U.S. at 168, 97 S.Ct. at 2226. *See also Jeffers v. United States*, 432 U.S. 137, 150, 97 S.Ct. 2207, 2215, 53 L.Ed.2d 168 (1977); *United States v. Neal*, 692 F.2d 1296, 1306 (10th Cir.1982).

■■■ However, we believe that the conduct charged fits more squarely into count 5. The plain language of subsection (a)(2) indicates that it was designed to punish a person who permits property which they manage and control to be used by a third person for the activity relating to narcotics. Essentially, subsection (a)(2) seeks to punish the lessor, not the lessee. *See United States v. Chen*, 913 F.2d 183, 190 (5th Cir.1990) ("§ 856(a)(2) is designed to apply to the person who may not have actually opened or maintained the place for the purpose of the drug activity, but who has knowingly allowed others to engage in those activities"). Whereas, the language of subsection (a)(1) indicates that it was designed to punish a person who uses his own property for the activity relating to narcotics. *See id.* at 189–90 ("purpose" requirement of subsection (a)(1) applies to person who knowingly opens and maintains place for the illegal activity). The government's suggestion that (a)(2) can be used to

---

**13.** Section 856 was originally enacted as part of the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 1841, 100 Stat. 3207, 3207–52. Its purpose was to "outlaw[ ] operation of houses or buildings, so-called 'crack houses,' where 'crack,'

cocaine and other drugs are manufactured and used." H.R.Rep. No. 99–5484, 99th Cong., 2d Sess., *reprinted at* 132 Cong.Rec. S13779 (daily ed. Sept. 26, 1986).

punish the lessee is a misapplication of the statute to the facts of this case and would render superfluous the language "with or without compensation." Rather, Senior's conduct is more properly punished under subsection (a)(1). In light of this, Senior's conviction on count 6 must be vacated as multiplicious.

## B.

■ In determining whether the two conspiracies charged in counts 1 and 2 for which Junior was convicted are multiplicious, "'the relevant inquiry is whether there existed more than one *agreement* to perform some illegal act or acts.'" *United States v. Swingler*, 758 F.2d 477, 491–92 (10th Cir.1985) (quoting *Ward v. United States*, 694 F.2d 654, 661 (11th Cir.1983)). "A single agreement to commit several crimes constitutes one conspiracy. By the same reasoning, multiple agreements to commit separate crimes constitute multiple conspiracies." *United States v. Broce*, 488 U.S. 563, 570–71, 109 S.Ct. 757, 763, 102 L.Ed.2d 927 (1989).

Counts 1 and 2 allege the same conspirators and time frame. The underlying drug trafficking offenses of the unlawful objective in count 2 mirror the unlawful objectives of count 1. Further, count 2 alleges the same conspiracy charged in count 1 as an additional underlying drug trafficking offense. Thus, the circumstances indicate that there was but a single agreement. *See United States v. Anderson*, 872 F.2d 1508, 1520 (11th Cir.1989) (three conspiracies covering the same general time frame and relating to the sale or transfer of the same government munitions and explosives were multiplicious).

■ However, if Congress intended multiple convictions and sentences under 18 U.S.C. § 371 and 21 U.S.C. § 846 for a single agreement to traffic in narcotics and to use a firearm during the narcotics trafficking, there would be no barrier to the dual convictions and multiple sentences. *See Garrett*, 471 U.S. at 779, 105 S.Ct. at 2411. The legislative history of § 846 is silent as to whether Congress intended to impose multiple sentences for a single conspiracy which violates both § 846 and another conspiracy statute. *Albernaz*, 450 U.S. at 341 n. 1, 101 S.Ct. at 1143 n. 1. Moreover, nothing about 18 U.S.C. § 371 leads us to conclude that Congress intended multiple convictions and sentences for a conspiracy that violated it and another, more specific conspiracy statute.[14]

Because the statutory language as well as the legislative history is silent, we apply the *Blockburger* test to determine whether Congress intended a conspiracy to violate 18 U.S.C. § 924(c) charged under 18 U.S.C. § 371 and a 21 U.S.C. § 846 narcotics conspiracy to be subject to multiple punishment. *Albernaz*, 450 U.S. at 337, 101 S.Ct. at 1141. Applying *Blockburger*, a conspiracy to use or carry firearms during and in relation to the commission of a drug trafficking offense is not the same offense as a conspiracy to commit a drug trafficking offense. In *Albernaz*, the Court held that the two conspiracies charged under separate statutes were separate offenses under *Blockburger* because one required proof of an agreement to distribute marijuana and the other required proof of an agreement to import marijuana. *Albernaz*, 450 U.S. at 339, 101 S.Ct. at 1142. Here, count 1, the marijuana conspiracy, requires proof of an agreement to manufacture, distribute and possess with intent to distribute marijuana. Whereas count 2, the firearms conspiracy, requires proof of an agreement to use or carry firearms during and in relation to the commission of the drug trafficking offense. Although the firearms conspiracy requires proof that the defendant intended

14. While the substantive crime of 18 U.S.C. § 924(c), alleged as the unlawful objective of the § 371 conspiracy, expressly provides for consecutive sentences for the underlying drug trafficking offense and the use of a firearm during its commission, in a § 371 conspiracy case, the unlawful § 924(c) objective is not relevant in determining congressional intent to pro- vide for multiple sentences for a single conspiracy charged under § 371 and § 846. *See Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942) ("[a] conspiracy is not the commission of the crime which it contemplates, and neither violates nor 'arises under' the statute whose violation is its object").

to commit an underlying drug trafficking offense, it does not necessarily require an agreement among the conspirators to commit a drug trafficking offense. Therefore, the objectives of the conspiracies are distinct. Counts 1 and 2 are not the same offense under *Blockburger;* therefore, counts 1 and 2 are not multiplicious.

## V.

 Hill contends that the district court's reliance on U.S.S.G. § 2D1.1 in calculating his sentencing guideline range was improper. Section 2D1.1 is the applicable guideline for drug trafficking offenses. The offense level for drug trafficking offenses is based on the quantity of drugs involved. U.S.S.G. § 2D1.1(c). The offense level for a drug trafficking conspiracy is "the same as if the object of the conspiracy ... had been completed." *Id.* § 2D1.4(a). The district court, in accepting the findings of the presentence report, calculated Hill's base offense level at 26 based on 367 kilograms of marijuana. *Id.* § 2D1.1(c)(9). Additionally, the district court imposed a two-level enhancement for use of a firearm. *Id.* § 2D1.1(b)(1). Based on an offense level of 28 and a criminal history category of I, Hill's guideline range was 78–97 months. The district court sentenced Hill to 60 months which was the maximum sentence under 18 U.S.C. § 371, the statute of which he was convicted.

Applying § 2D1.1 to Hill was error because he was not convicted of a drug conspiracy. Section 2D1.1 is applicable to drug trafficking offenses charged under 21 U.S.C. §§ 841(a), (b)(1–3), 960(a), (b). U.S.S.G. § 2D1.1, comment. Similarly, § 2D1.4 is applicable to drug trafficking conspiracies charged under 21 U.S.C. §§ 846, 963. U.S.S.G. § 2D1.4, comment. Hill's presentence report erroneously stated that the objective of the conspiracy for which he was convicted was "attempt to manufacture, distribute, and/or possess with intent to distribute in violation of 21 U.S.C. § 841(a)(1)." In fact, Hill was convicted solely of a conspiracy, charged un-der 18 U.S.C. § 371, to use or carry firearms during and in relation to the commission of a drug trafficking offense in violation of 18 U.S.C. § 924(c).

While a defendant must have intended to commit a drug trafficking crime in order to be convicted of a conspiracy to violate 18 U.S.C. § 924(c), a conspiracy to use or carry firearms during and in relation to the commission of a drug trafficking offense is distinct from a conspiracy to commit the drug trafficking offense. It would be inconsistent to hold that the count 2 firearms conspiracy was distinct from the count 1 marijuana conspiracy in determining that the counts were not multiplicious and then hold that counts 1 and 2 were the same conspiracy for sentencing purposes.

The appropriate guideline for 18 U.S.C. § 371 conspiracies is § 2X1.1. U.S.S.G. § 2X1.1, comment. (backg'd). Under this guideline, the base offense level is determined by the guideline for the substantive offense plus any adjustments from such guideline that can be established with reasonable certainty. *Id.* § 2X1.1(a).

Application of this guideline provides some difficulty, however, because the guideline for the substantive offense, 18 U.S.C. § 924(c), does not provide a base offense level, but rather provides that "the term of imprisonment is that required by statute." U.S.S.G. § 2K2.4(a). While we can understand the Sentencing Commission's promulgation of this guideline given Congress' imposition of mandatory sentences for substantive violations of 18 U.S.C. § 924(c), the guideline provides no assistance in determining a base offense level by which to calculate the offense level for a conspiracy to violate § 924(c). In this situation, it is appropriate to "apply the most analogous offense guideline." U.S.S.G. § 2X5.1.

We believe the "most analogous offense guideline" is U.S.S.G. § 2K2.1(a)(7) which expressly applies to "prohibited transactions involving firearms." Under the current version of this guideline, Hill's base offense level is 12.[15] Additionally, the dis-

---

15. Section 2K2.1 was amended in November 1990 and November 1991. *See* United States

trict court should apply any specific offense characteristics under § 2K2.1(b) that can be determined with "reasonable certainty." *See, e.g.,* U.S.S.G. § 2K2.1(b)(1) (one to six level enhancement depending on the number of firearms involved); *id.* § 2K2.1(b)(5) (four level enhancement with a minimum offense level of 18 if firearm was "used or possessed in connection with another felony offense"). Because the count for which Hill was convicted was a conspiracy, the district court must then determine whether Hill should receive a three-level downward adjustment pursuant to § 2X1.1(b)(2). Due to the factual nature of the inquiry required to determine the specific offense characteristics, Hill's offense level must be determined by the district court on remand.

■ Finally, we note that Hill received a two-level upward adjustment pursuant to U.S.S.G. § 2D1.1(b)(1) for use of a firearm during the commission of a drug trafficking offense. Because we have determined that the charge for which Hill was convicted is more properly characterized as a firearms conspiracy rather than a drug conspiracy, this adjustment is improper. The guidelines recognize that

> [t]o avoid double counting, when a sentence under [U.S.S.G. § 2K2.4] (which is applicable to substantive violations of 18 U.S.C. § 924(c)) is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for firearm discharge, use, or possession is not applied in respect to such underlying offense.

U.S.S.G. § 2K2.4, comment. (backg'd). *See also id.,* comment. (n. 2). While Hill's sentence was not imposed in conjunction with

a sentence for another offense, the underlying rationale of avoiding double counting applies with equal force when the object of the conspiracy for which a defendant is convicted is to use or carry firearms. Therefore, a two-level upward adjustment under § 2D1.1(b)(1) is not applicable to Hill's offense level.[16]

## VI.

■ Junior received a mandatory minimum five year sentence for his conviction under count 1. *See* 21 U.S.C. §§ 841(b)(1)(B)(vii), 846. Junior claims that because count 1 failed to allege the quantity of marijuana involved, the mandatory minimum which is based on the quantity of marijuana may not be applied.

In pre-guidelines cases, we have held that the government must allege in the indictment the quantity of controlled substance involved in order to trigger the enhanced sentencing provisions of § 841. *United States v. Crockett,* 812 F.2d 626, 629 (10th Cir.1987). *See also United States v. Jenkins,* 866 F.2d 331, 334 (10th Cir.1989) (*Crockett* bars enhanced sentence under § 841 absent a quantity allegation in the indictment); *United States v. Brandon,* 847 F.2d 625, 631 (10th Cir.) ("[t]he quantity possessed by the defendant is a necessary element which the government must allege and prove to obtain the greater penalty provided under § 841(b)(1)(B)[ ]"), *cert. denied,* 488 U.S. 973, 109 S.Ct. 510, 102 L.Ed.2d 545 (1988). More recently, however, we have stated that "*Crockett,* a pre-guideline case, is inapposite to post-guideline cases." *United States v. McCann,* 940 F.2d 1352, 1358 (10th Cir. 1991) (citing *United States v. Ware,* 897 F.2d 1538, 1542–43 (10th Cir.), *cert. de-*

---

Sentencing Commission, *Guidelines Manual,* § 2K2.1, comment. (historical note) (Nov.1991); *id.* App. C, ¶¶ 333, 374. To the extent that an earlier version of § 2K2.1 in effect on the date of the offense would result in a lower offense level, Hill would be entitled to application of the earlier version because "the ex post facto clause prohibits retroactive application of a changed guideline if the change disadvantages the defendant." *United States v. Underwood,* 938 F.2d 1086, 1090 (10th Cir.1991). *See also United States v. Saucedo,* 950 F.2d 1508, 1513 (10th Cir.1991).

16. Hill also contends that § 2D1.1's presumption that one marijuana plant is the equivalent of one kilogram of marijuana is arbitrary and capricious, and the district court erred in including the total amount of marijuana seized from Senior's residence in calculating his base offense level. Because we agree that § 2D1.1 is not the applicable guideline, we need not address these contentions.

*nied,* — U.S. —, 110 S.Ct. 2629, 110 L.Ed.2d 649 (1990)).

Junior attempts to distinguish *McCann* on its facts. Admittedly, the issue before the court in *McCann* was whether the stipulation between the government and the defendant that the quantity of chemical that the defendant pled guilty to possessing was not "readily provable" precluded the district court from considering all relevant conduct in determining the offense level under the sentencing guidelines. Nevertheless, after determining that the district court should have considered all relevant conduct, the court proceeded to hold that defendant's guilty plea was not knowing and intelligent because defendant was not told that the mandatory minimum sentence was applicable. In reaching this conclusion the court stated that "the imposition of a mandatory minimum sentence under the guidelines cannot be eliminated from the court's consideration simply because a specific amount of drugs was not alleged in the indictment." *Id.* The plain language of *McCann* leads us to conclude that the imposition of a mandatory minimum sentence under 21 U.S.C. § 841 is not precluded by an indictment's failure to allege the quantity of controlled substance in post-guidelines cases.[17]

▇▇▇ Alternatively, Junior contends that *McCann,* which was decided after he was sentenced, should not be applied retroactively. In the area of constitutional criminal procedure, the Supreme Court has held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases ... pending on direct review or not yet final...." *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987). Retroactive application of new rules to cases pending on direct appeal protects "the integrity of judicial review" and ensures that similarly situated defendant's are treated the same. *Id.* at 323, 107 S.Ct. at 713. In *Griffith,* the Supreme Court held that the rule announced in *Batson v. Kentucky,* 476 U.S.

79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), applied to all cases pending on direct review. *Griffith,* 479 U.S. at 316, 107 S.Ct. at 709. In doing so, the *Griffith* Court held that the "clear break" exception, which recognized that a new rule overruling past precedent or disapproving of a practice previously sanctioned is not applied retroactively, was not applicable to cases pending on direct review. *Id.* at 326, 107 S.Ct. at 715.

The analysis and holding of *Griffith* must be considered in the context of the rule at issue. *Batson* expanded the rights of criminal defendants by lowering the defendant's burden in establishing a prima facie case of racial discrimination in jury selection. In contrast, the rule announced in *McCann* arguably constricts the rights of criminal defendants by eliminating the government's duty to allege the quantity of controlled substance in order to trigger a mandatory minimum sentence under 21 U.S.C. § 841. The retroactive application of a judicial rule constricting the rights of a criminal defendant raises due process concerns analogous to the ex post facto limitations on the retroactive application of criminal statutes. *See Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (retroactive application of judicial expanded definition of illegal obscenity violated due process); *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) (retroactive application of judicially expanded statutory definition of trespass violated due process). Although *Marks* and *Bouie* were concerned with judicial decisions expanding the scope of conduct that could be punished under the statute, we have applied their reasoning to the retroactive application of judicial decisions which enhance a defendant's punishment. *See Devine v. New Mexico Dept. of Corrections,* 866 F.2d 339, 343–45 (10th Cir.1989) (retroactive application of state supreme court decision increasing the time defendant had to serve prior to parole eligi-

---

**17.** Junior also directs our attention to *United States v. Puryear,* 940 F.2d 602 (10th Cir.1991), which was decided one week after *McCann* and in which we recognized in dicta that drug quan-

tity must be alleged in the indictment for drug trafficking cases. *Id.* at 604 n. 2. Given the clear language of *McCann,* we do not believe that *Puryear's* dicta supplants it.

bility violated due process). *See also Rubino v. Lynaugh,* 845 F.2d 1266, 1274 (5th Cir.1988) (retroactive application of state supreme court decision would violate due process to the extent it enhanced the degree of defendant's punishment).

■ The test for determining whether the retroactive application of a judicial decision violates due process is essentially one of foreseeability. A decision is unforeseeable if it is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct at issue.'" *Bouie,* 378 U.S. at 354, 84 S.Ct. at 1703. Perhaps the clearest example is when a court overrules its own precedent. *See Marks,* 430 U.S. at 192–96, 97 S.Ct. at 993–95.

Junior argues that *McCann* overruled *Crockett* and therefore it was unforeseeable and should not be applied retroactively. However, *McCann* does not nor could not reverse *Crockett. See United States v. Spedalieri,* 910 F.2d 707, 710 n. 3 (10th Cir.1990) (three-judge panel cannot overrule circuit precedent). Rather, *McCann* distinguishes *Crockett* and holds that it is not applicable to post-guidelines cases.

The sentencing guidelines were promulgated well before Junior participated in the marijuana conspiracy. The guidelines clearly provided that all relevant conduct would be taken into account in determining the appropriate sentence. U.S.S.G. § 1B1.3(a)(2). In March 1990, we held that all controlled substances that were part of a common plan or scheme would be considered in determining the base offense level for narcotics offenses pursuant to U.S.S.G. § 2D1.1. *United States v. Rutter,* 897 F.2d 1558, 1562 (10th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 88, 112 L.Ed.2d 60 (1990). We believe that these events are sufficient to have put Junior on notice that he would be subject to a mandatory minimum sentence under 21 U.S.C.

§ 841 despite the absence of a quantity allegation in the indictment.

## VII.

■ Senior contends that the two-level enhancement for possession of a firearm during the commission of a drug trafficking offense was improper.[18] Section 2D1.1 of the Sentencing Guidelines provides for a two-level increase in the base offense level if the defendant possessed a firearm during the commission of a drug trafficking offense. U.S.S.G. § 2D1.1(b)(1). Senior's acquittal on the substantive § 924(c) charge does not persuade us as to the inapplicability of U.S.S.G. § 2D1.1 because the standard to convict on § 924(c) "is much higher than that necessary for an enhancement under the Guidelines." *United States v. Goddard,* 929 F.2d 546, 549 (10th Cir.1991). "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n. 3).

As stated earlier, the evidence at trial indicated that marijuana cultivation activity was occurring near the house on April 13. Near the door of the house leading to the carport, officers found a loaded .22 caliber rifle. In Senior's truck which the evidence at trial indicated had been used for marijuana cultivation, officers discovered a loaded AR–15 rifle of which Junior admitted ownership. Finally, near the shed where the tractor which had been used for the cultivation was parked, officers discovered Lane's loaded .22 caliber rifle. In light of the proximity of the rifles to the cultivation, we cannot say that it was clearly improbable that the weapons were connected with the offense. *See Goddard,* 929 F.2d at 549 (§ 2D1.1(b)(1) applicable when defendant knew coconspirator possessed gun). Thus, the two-level upward adjust-

---

**18.** Junior and Hill raise a similar argument. We have already determined that the enhancement was improper as to Hill who was convicted solely of the count 2 firearms conspiracy. As to Junior, we need not address the argument because he received the five-year mandatory minimum sentence as required for his conviction on the count 1 marijuana conspiracy. Similarly, we need not consider Junior's additional argument that the district court improperly refused to consider a downward departure.

ment pursuant to U.S.S.G. § 2D1.1(b)(1) was proper.

We AFFIRM the convictions and sentence of John Wesley Morehead, Sr., on counts 1, 2, 3, 4, 5 and 7, but REMAND to the district court with instructions to VACATE his conviction on count 6 as multiplicious. We AFFIRM the convictions and sentence of John Wesley Morehead, Jr., on counts 1 and 2. We AFFIRM the conviction of Jackie Ray Hill on count 2 but REMAND to the district court with instructions to VACATE his sentence and resentence him consistent with this opinion.

JOHN P. MOORE, Circuit Judge, dissenting:

I must respectfully dissent from that part of the court's opinion sustaining the conviction of Mr. Hill. I cannot agree there was sufficient evidence to support it. The issue is close; however, I believe the court relies upon inferences rejected by the jury to reach its conclusion. As a result, I cannot agree.

To focus upon the issue, we must first examine the indictment. The charged offenses are both specific and intertwined. Count 1 charges a conspiracy to manufacture, possess with intent to manufacture, and distribute marijuana. The means of the conspiracy alleged are, in general terms: 1) obtaining and maintaining the place, funds, tools, and seeds to plant, cultivate, and harvest marijuana; 2) arranging for the security of the places where marijuana was grown and *"strategically locating firearms against an eventuality or circumstances in which such firearms were intended to or would be used"* (emphasis added); 3) taking steps to avoid detection by law enforcement officers; 4) other specific acts relating to the growing of marijuana.

Count 2 charges the three defendants conspired to use or carry firearms "during and in relation to" the commission of: 1) manufacturing marijuana; 2) possessing marijuana with intent to distribute; 3) distributing marijuana; 4) *conspiring* to manufacture, possess with intent to distribute, and distributing, marijuana. The means of

the conspiracy charged under count 2 were that: 1) "certain of the defendants" traveled from Oklahoma to Texas to "attempt to manufacture, and/or possess with intent to distribute marijuana;" 2) the defendants later did the same things in the state of Oklahoma; 3) "[i]n an attempt to secure the clandestine marijuana manufacturing operation ... the defendants assembled, possessed, and/or maintained" firearms and ammunition "in and near various buildings at or near the laboratory site."

Although stated in separate counts, the conspiracies charged embrace essentially the same events. The theory of prosecution was that the defendants conspired to conduct a marijuana business and that they conspired to use or carry firearms in connection with that business *and* in connection with the conspiracy to conduct the marijuana business. (A conspiracy within a conspiracy). Thus, the conspiracy charged in count 2 consisted of an agreement coupled with two distinct elements of criminal conduct: 1) the overt acts relating to carrying on the marijuana business; 2) agreeing with others to carry on the marijuana business. To convict on the count 2 conspiracy, the government had to prove at least one of the two elements *and* the agreement.

By acquitting Mr. Hill of all other counts, the jury found the evidence insufficient to prove he distributed, manufactured, or intended distribution of marijuana. Thus, there is insufficient evidence on the first element of distinct conduct contained in count 2. The jury also found the evidence insufficient to prove Mr. Hill agreed with others to engage in the marijuana business; therefore, it determined the evidence insufficient to prove the second distinct element of conduct. It is therefore impossible for Mr. Hill to have been found guilty of conspiring to use or carry firearms in connection with conduct that was not proved.

The very interrelation of the charges will not permit such an inconsistent result. Because the criminal transactions were made interdependent, it is a logical inconsistency to suggest that the evidence on count 2

could be found sufficient when the same evidence was wanting in count 1.

I have a further basis for disagreement, however. The court seems to take the position that 18 U.S.C. § 924(c) defines a firearms offense which can be established without proof of the commission of an independent substantive offense. If that is the court's conclusion, I cannot agree.

First, the statutory language will not permit such an interpretation. The section provides:

> Whoever, *during and in relation to any crime of violence or drug trafficking crime* ... uses or carries a firearm, shall, in addition to the crime, be sentenced to imprisonment. . . .

The offense is, as noted by the court, a "firearms offense," but it is not an offense which can be committed simply by carrying or controlling a firearm. An essential element of the § 924(c) offense is the connection with a "crime of violence or drug trafficking crime." Any other conclusion is contrary to the express language of the statute. Indeed, "[b]ecause all elements of the crime created by section 924(c)(1) must be proved for conviction under that section, a defendant charged with violating section 924(c)(1) must be proven to have committed the underlying crime." *United States v. Hunter,* 887 F.2d 1001, 1003 (9th Cir.1989). We have already neared this conclusion in *United States v. Henning,* 906 F.2d 1392, 1399 (10th Cir.1990), when we observed, "[s]ection 924(c) is an enhancement statute enacted to punish those drug traffickers who choose to carry on their trade with the assistance of a firearm."

In this case, the government failed to prove the underlying crimes. No amount of reconsideration of the inferences that would have allowed the jury to convict on those offenses can resurrect them. With-

out proof that the underlying substantive offenses were committed, a conviction on § 924(c)(1) cannot stand.[1]

Having reached this conclusion, I do not consider whether the district court properly applied the guidelines in arriving at Mr. Hill's sentence. I do not, therefore, join in the court's opinion on that issue except to suggest the court's difficulty in resolving the problem it presents is the result of the inconsistency in the verdicts. I would reverse Mr. Hill's conviction.

---

1. I say this with full knowledge of *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). The court relies upon *Powell's* admonition that a review of the sufficiency of the evidence should be conducted independent of the jury's determination of the sufficiency of the evidence on another count. The Court also said, however, "[t]he government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilty beyond a reasonable doubt." *Powell,* 469 U.S. at 67, 105 S.Ct. at 478. The interdependence of the charges in the indictment lead me to conclude in this instance the jury could not have rationally acquitted on one count and convicted on the other.